## APPEAL OF ELIZABETH M. NEELY.

[Estate of Robert Neely, Deceased.]

FROM THE DECREE OF THE ORPHANS' COURT OF CHESTER COUNTY.

Argued February 14, 1889—Decided February 25, 1889.

1. In the absence of a disclosure by the intended husband at the time an ante-nuptial contract is executed, of the full extent of his estate, if the provision for the future wife be unreasonably disproportionate thereto, it raises the presumption of a designed concealment and throws the burden upon him to show that it is fair.

2. But, in the present case, considering the relationship of the parties, their ages, the known estates owned by each, the uncle and two brothers of the intended wife present at the execution of the contract, one of the latter being made trustee therein, with the benefits conferred upon the wife in the will of her husband, the provision for the intended wife, though not liberal, was adequate, and there was no evidence of either actual or constructive fraud sufficient to avoid the contract.

3. Whether, in a proceeding by the wife, instituted after her husband's death to set aside an ante-nuptial settlement, the trustee named in the contract and executing the same with the parties, is a competent witness for the wife, not decided.

4. Kline v. Kline, 57 Pa. 120; Shea's App., 121 Pa. 302; Ludwig's App., 101 Pa, 535; Smith's App., 115 Pa. 319, considered.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 415 January Term 1888, Sup. Ct., court below, No. . . . . Term 1887, O. C.

On June 17, 1887, Elizabeth M. Neely presented her petition to the Orphans' Court, setting forth:

That she was the widow of Robert Neely, late of the borough of West Chester, deceased, who died May 1, 1884, having first made his last will and testament, dated October 17, 1884; that by his said will the testator directed his executors to set apart sufficient of his personal estate to produce such an income as would pay to the petitioner the annuity of six hundred dollars, provided for and agreed to be paid her by an ante-nuptial contract between them, dated May 16, 1874, and by a codicil to said will the testator had further devised to her the homestead occupied by him and all the furniture therein during so long a term as she should occupy the same; that said will and codicil were duly admitted to probate and letters thereon issued to J. Joseph Graham, Isaac Graham and Alfred P. Reid, the executors therein named, who in due time had filed an inventory and appraisement showing the decedent to have been possessed of personal estate to the value of $82,166.85, and to have been seised of real estate to the value of $47,547.22.

That she was married to the testator on May 21, A. D. 1874; that at that time she was residing with her brother, Samuel M. McClure, and that her father had died some two years before; that a few days before their marriage, and more than two months after their betrethal, the testator brought to her a deed designated in the will as a marriage contract, and requested her to sign it; that the day for the marriage ceremony had then been fixed, the minister engaged and the wedding invitations issued; that the subject had never been alluded to

between them before; that he at no time gave her any infor-mation as to the value or character of his estate, nor had she any knowledge on the subject; that he told her it was abso-lutely necessary that she should sign the deed, and that there could be no marriage if she did not; that the reason he gave for insisting upon the contract was, that he had got his affairs fixed up, and that the marriage would upset them all unless she signed the paper; that she was greatly disconcerted and distressed by the request, and was unable to read the deed un-derstandingly and to realize its full import and effect; that her brother, Samuel M. McClure, was unable to advise her by rea-son of his inexperience; that she did not know how to act in the matter, and signed the deed only because of the urgent and imperative character of the testator's request, and from her confidence in him and in the integrity of his purposes.

That on December 6, A. D. 1884, she gave notice to the ex-ecutors that as such widow she desired and claimed to have retained, set apart and appraised for her use, personal property to the value of three hundred dollars, but that no attention had been paid to this notice; that more than one year had elapsed since the granting of letters testamentary to the executors, yet they had not exhibited any account and settlement of said estate. She therefore prayed the court:

1. To award a citation against the said J. Joseph Graham, Isaac Graham and Alfred P. Reid, executors, commanding them to exhibit such account and settlement or show cause to the contrary.

2. To award and decree that said marriage contract was without validity or binding force upon the petitioner, in the distribution of the said decedent's estate.

3. To order and direct the said executors to appraise and set apart for the use of the petitioner personal estate belonging to the estate of the said Robert Neely, deceased, to the value of three hundred dollars under her said election.

4. To award and decree to the petitioner as widow of the said Robert Neely, deceased, and against the provisions of his said will, one third of his net personal estate absolutely and one third of his real estate for life.

5. Such further and equitable relief, etc.

A citation was issued and the executors filed an answer

thereto, admitting that the statements in the petition as to the
death, will and marriage of the decedent, the granting of letters
testamentary, the inventories of his estate, and the demand for
the widow's appraisement, were true, but denying that the
petitioner was entitled to the relief prayed for, by reason of a
marriage contract entered into between the petitioner and the
decedent prior to the marriage, and duly executed on May 16,
1874. They further denied all the allegations of the petitioner
as to the manner and circumstances under which said contract
or deed was executed, and averred on the contrary that the
petitioner was well acquainted with the character and value of
the estate of the said Robert Neely at the time of the execution
of the deed; that at that time she was possessed of a large per-
sonal estate which she desired, in case of her death before him,
should go to her own relatives; that the deed was executed in the
presence of two of her brothers and an uncle, one of said brothers
being a party to the contract and the other brother and uncle
being witnesses thereto; that the petitioner advised with and
consulted said parties as to the execution of said deed, and the
same was executed with their full knowledge and approbation;
that the said Robert Neely at the time the deed was executed
had two children, the issue of former marriages, and the peti-
tioner was a maiden lady, and the provisions for her in the
deed were under the circumstances reasonable and proper;
that the deed was fully and freely agreed to by the petitioner;
that the consideration therefor was good and valuable and the
deed a valid and binding contract and a bar to the claim of the
petitioner in this proceeding.

Subsequently the petitioner joined issue upon the matters
alleged in the answer, and the proceedings were then referred
by the court to *Mr. William B. Waddell,* as auditor, who pro-
ceeded so far in the case as to hear all the testimony offered
by both the petitioner and the respondents, when it was agreed
by all parties in interest, that the testimony thus taken should
be submitted to the court, together with the petition and an-
swer, and the court should examine, consider, and pass upon
the questions involved.

On July 11, 1887, the testimony taken before the auditor
was filed, and the cause was then argued before FUTHEY, P. J.,

and WADDELL, J. On January 11, 1888, the decision of the court, WADDELL, J., was filed and was in part as follows:

At the time of the marriage in question, Robert Neely was about sixty years of age and Elizabeth M. McClure about fifty. They were cousins, but there appears to have been but little intercourse between them prior to the visiting which resulted in their betrothal. This extended over a period of six months. He was a farmer and lived upon his farm, a few miles distant from Miss McClure's residence. She resided with her brother. Her father died some two years before the engagement.

It will be seen that all the material allegations of the petition, as to the circumstances attending the execution of the ante-nuptial contract, are denied by the respondents. Some proof of these circumstances was therefore necessary. The petitioner accordingly called her brother, Samuel M. McClure, as a witness, for the purpose of showing when and where the contract was executed, and what then took place. He was objected to as incompetent, because he was a party to the contract, and one of the other parties, to wit, Robert Neely, was deceased. The testimony of the witness was taken under this objection, with the understanding that its validity should be passed upon when the case came to be considered. We are, therefore, now called upon to determine whether Samuel M. McClure is a competent witness.

The deed in question was executed on May 16, 1874, between Robert Neely of the first part, Elizabeth M. McClure of the second part, and Samuel M. McClure of the third part. By its terms, Mr. Neely covenants with Samuel M. McClure, as trustee for Elizabeth M. McClure, that she shall have the absolute control of her property during his life, and at her death neither he nor his representatives will claim any share of it; and further, that in case the marriage shall be solemnized, and she shall survive her intended husband, an annuity of six hundred dollars shall be paid her during her life. On the other hand, Elizabeth M. McClure covenants with Samuel M. McClure, as her trustee, that she will not make any claim of any kind, on Mr. Neely's estate, save for the annuity, and then and there renounces all such other claims. Thereupon Samuel M. McClure accepts these trusts and covenants, and

Decision of Court below.

then covenants with each separately that upon the death of either, he will use and improve the covenants made to him in the best manner that may be in his power, so as to exonerate the estate of the one who has died from all claims of the sur-, vivor, save the annuity. Under the terms of the contract Samuel M. McClure has duties to perform, and assumes important liabilities. He is an active party to the instrument.

Thus the original parties to the contract were Robert Neely, Elizabeth M. McClure and Samuel M. McClure. One of these parties is now dead, and another one of them has instituted these proceedings to avoid the contract. It is resisted by the executors of the deceased party, who have become parties to the proceedings to protect the legatees under the will of said deceased, and the direct question involved in the controversy is, shall this ante-nuptial contract be abrogated. It is made the duty of the trustee to uphold the contract against either party undertaking to defeat it.

[The court, considering Fross' App., 105 Pa. 265; Karns v. Tanner, 66 Pa. 305; Alcorn v. Cook, 101 Pa. 214; Adams v. Bleakley, 117 Pa. 283; Hanna v. Wray, 77 Pa. 30; Hunt's App., 100 Pa. 590; Arthurs v. King, 84 Pa. 525; McFerren v. Iron Co., 76 Pa. 188; Craig v. Brendel, 69 Pa. 153; § 5, act of May 23, 1887, P. L. 158, proceeded:]

Samuel M. McClure was a party to the original transaction, and still remains so. The interest he had at that time still continues. In whatever aspect, therefore, we view him, whether as a party to the original transaction or as a person adverse in interest, in our opinion we must regard him as an incompetent witness and must exclude his testimony.

If we are justified in thus rejecting the testimony of Samuel M. McClure, the only evidence left for our consideration is the deed itself: the estimated value of the estates of Robert Neely and Elizabeth M. McClure at the time of the execution of the deed, the will of Robert Neely, deceased, and the mental condition of Miss McClure, now Mrs. Neely, for several days preceding her marriage and some of the circumstances attending that event.

The marriage contract was executed on May 16, 1874, by Robert Neely, Elizabeth M. McClure and Samuel M. McClure, at the residence of the latter, in the presence of James

McClure and Joseph M. McClure. Samuel and Joseph M. McClure were the brothers of Elizabeth M. McClure, and James McClure was her uncle, a brother of her father. She and Samuel M. resided together.

By the terms of this contract Elizabeth M. McClure was to retain the absolute control of the property which she then had, or might thereafter acquire during the life of Robert Neely, and at her death neither he nor his representatives were to claim any share of it; the said Robert Neely, at his death, was to cause or secure the sum of six hundred dollars to be paid annually to her during her natural life, in lieu of dower or right of thirds or any other claim in and to his estate. She accepted the covenants and agreed in consideration of them that she would not make any claim or demand whatsoever on the estate of the said Robert Neely other than for the annuity aforesaid.

The testimony as to the value of the estates of the respective principal parties to the agreement is not very satisfactory; but, acting upon the best information furnished us, we fix the personal estate of Robert Neely at the time of the execution of the deed at fifty thousand dollars, and his real estate at twenty-eight thousand five hundred dollars. At the time of his death he appeared to have left a net personal estate of $63,795, and his real estate was valued at $50,547; and since his death his real estate has yielded an annual income of about $1,950. It is agreed by the parties that Elizabeth M. McClure's estate, at the time of the execution of the deed, was worth about twelve thousand dollars ($12,000), and was all personalty.

Robert Neely and Elizabeth M. McClure were married at the house of Samuel M. McClure, her brother, on May 21, 1874, by the Rev. Mr. Holifield, her pastor, assisted by the Rev. Mr. McColl, the pastor of Mr. Neely. She and her brother had continued to reside together at the old homestead after the death of her father, up to the time of her marriage.

The father died about 1872; Joseph M. McClure died about 1878 and James M. McClure died about 1882. Robert Neely died on November 1, 1884, having first made his last will and testament, dated October 17, 1884, which was duly probated on November 10th following.

By his will he secured the payment to his wife, Elizabeth M. Neely, of the annuity of six hundred dollars, provided for and agreed to be paid her by the marriage contract of May 16, 1874, and by a codicil of the same date, he gave and devised to his wife the premises occupied by them at the time of his death, and all the furniture in the same, during so long a term as she should occupy the same. This provision by the codicil appears to have been brought about by the solicitations of his wife, and suggestions made by Mr. Reid, who prepared his will.

As we have already said, these parties were married on May 21, 1874. The wedding invitations were sent out to some forty or fifty friends and relatives some two weeks before this. A caterer from West Chester was engaged some time before, to prepare the wedding entertainment.

The parties were cousins, but there seems to have been but little personal intercourse between them, prior to the six months before the marriage. Mr. Neely then began his attentions to Miss McClure, and visited her always once a week, and sometimes oftener.

After his visit on Saturday, May 16th, a decided change was observed in Miss McClure's conduct. Before that she was bright and cheerful. She then became distressed and was frequently found in tears. The change was so marked as to attract the attention of her dressmaker and housekeeper, and so continued until her marriage. No cause for this was assigned, and none could be given by those about her.

Mr. Neely had a son by his second wife, and held the estate of this wife in trust for the benefit of this son. At his death this estate amounted to about $62,000, and goes entirely to his son. He also left to survive him a grandson, the child of a deceased son, by his first wife. The present Mrs. Neely was his third wife. He was an active, shrewd business man, and looked closely after his affairs. He was skillful in the management of his investments, and successful in the accumulation of his property.

These are the facts of the transaction, as shown by the testimony, independent of that given by Samuel M. McClure. Are they sufficient to warrant the court in setting aside this contract?

It is a settled rule of law, that the parties to an ante-nuptial

contract do not deal at arm's length, but stand in a confidential relation, requiring the exercise of the greatest good faith. There should be a full disclosure of the circumstances and property of each: Bierer's App., 92 Pa. 266. In the absence of any proof on the subject, we are entitled to presume that such disclosures were made, but any designed or material concealment ought to avoid the contract at the will of the party who has been injured: Kline v. Kline, 57 Pa. 122; Smith's App., 115 Pa. 319. If, however, the provision secured for the wife is manifestly unreasonable and disproportionate to the means of the intended husband, it raises a presumption of intended concealment, and throws upon him the burden of disproving that presumption: Bierer's App.; Smith's Appeal; Kline v. Kline, supra; Kline's Est., 64 Pa. 122. We are unable to say whether such disclosures were made by the parties to the contract in question, as we have no proof as to what took place between them on this subject. In the absence of such proof we are entitled to presume that they did. It therefore becomes important to inquire, whether the provision made for the intended wife is manifestly unreasonable and disproportionate to the means of the intended husband, so as to raise a presumption of the intended concealment, and thus throw on the executors of his estate the burden of disproving this presumption.

We have already found as a fact, that the personal estate of Robert Neely, at the time this deed was executed, was worth fifty thousand dollars, and his real estate was worth. twenty-eight thousand five hundred dollars. The annual rental value of this real estate at his death is shown to be about nineteen hundred and fifty dollars. We have no testimony showing a change in its rental value since 1874, and therefore we may presume it was worth about the same at that time. At the same period of time, the estate of Elizabeth M. Neely was worth about twelve thousand dollars. Her estate, therefore, at the time the deed was executed, was about the one fourth part of his. The deed provided that she should retain absolute control of the estate which she then had, or might thereafter acquire. It was to remain hers absolutely, and be entirely independent of her intended husband. This estate was wholly personal, and was thus freed from a possible, not to say probable, inher-

Decision of Court below.

itance by her husband. In the absence of such a contract, her share of his then personal estate would not exceed the sum of sixteen thousand seven hundred dollars. She was, therefore, yielding the possibility of obtaining this amount upon his death, to secure the absolute control of twelve thousand dollars of her own estate.

The deed further provides for the payment to her of an annuity of six hundred dollars. As we have already seen, Mr. Neely's real estate was estimated to be worth twenty-eight thousand five hundred dollars, and the rental value at nineteen hundred and fifty dollars, at the time this deed was executed. Under the most favorable circumstances her yearly income from this branch of his estate could hardly exceed the sum of six hundred dollars.

Comparing then the facts in this case with those developed in Smith's App., 115 Pa. 319, and considering the views of the court expressed in that case, we cannot say that the provision secured for the wife in the case in hand is so manifestly unreasonable and disproportionate to the means of the intended husband, as to create a presumption of fraud and concealment. She nowhere alleges that she was actually deceived, and we can hardly infer deception, when we consider the relative values of the estates of the two parties, and the mutual considerations moving them to enter into the contract. It is true, he may not have disclosed to her the extent and value of his estate, but we cannot infer from the facts of the case that he intentionally concealed from her this information, and designedly practiced a fraud upon her. We are unable to find either actual or constructive fraud in the execution of the contract, and must therefore hold it as binding upon the parties to it.

This being so, the petitioner has no such interest in nor claims against the estate of Robert Neely, as entitles her to obtain the relief prayed for, and we must dismiss her petition: Tiernan v. Binns, 92 Pa. 248; Dillinger's App., 35 Pa. 357.

If we should be wrong in rejecting Samuel M. McClure as a witness, it may be proper to consider what effect his testimony would have upon the proceedings. By his testimony it appears that Robert Neely was about sixty years of age and Elizabeth M. McClure about fifty at the time of the marriage. He was then living on his farm, about four miles from the

McClure homestead. He had always lived in that neighborhood. The parties are related, and he was intimate with the McClure family all his lifetime. He was frequently at their place when in active business, and he had been assisted pecuniarily by her father, when he was a young man. He was well known in the neighborhood as a successful man, and had the reputation at the time of this transaction of being rich. Elizabeth M. McClure had always resided with her father. She had little, if any, business experience, was of a nervous temperament and had no property, except what had been given her by her father, and which was in the stock of three banks. Part of this was given to her by him in his lifetime, and the rest bequeathed to her by his will. At the time of the marriage Robert Neely was an active, hearty man. He had been a drover, but was then out of active business, except as managing his own investments and the farm on which he lived. He began paying attention to Miss McClure in the fall of 1873. Their engagement was announced to Samuel M. McClure about the month of March, 1874. Some time prior to May 11, 1874, Mr. Neely consulted Mr. Wm. E. Barber, a member of the Chester county bar relative to a marriage contract, to be executed by him and Miss McClure. Mr. Barber prepared such a contract, and sent it to him by mail with a letter dated May 11, 1874. The first knowledge Elizabeth M. McClure or Samuel M. McClure had of such a contract was on Saturday, May 16th. On that day Robert Neely came to the home of Elizabeth M. McClure before dinner. In the early part of the afternoon, he produced the marriage contract thus prepared and all complete, except its date, and the initial letter of Samuel M. McClure's middle name, and asked Miss McClure to unite with him in its execution. This she apparently declined to do, for about three o'clock her brother, Samuel M. McClure, came into the room where these parties were, and found her in tears. He inquired the cause, and Mr. Neely pulled a paper out of his pocket, said that he had a marriage contract which he wanted Lizzie to sign. She declined to do so at that time, and in his presence, saying she thought it mean in Mr. Neely to ask her for a thing of that kind at this late day. He thereupon said to her, "If you don't sign it there will be no wedding."

After some conversation Mr. Neely inquired of Mr. McClure what he thought of it, and he replied that he knew nothing about it, he had never heard of a marriage contract. After some further conversation, Miss McClure consented to sign the paper, saying if there was time, and if it was not for the disgrace to the family calling in the invitations, she would never sign it. Mr. Neely, wishing to keep the execution of the paper within the knowledge of the family, suggested the calling in of James McClure and Joseph M. McClure as witnesses. They were seen by Samuel M. McClure, and informed of what was wanted, and about six o'clock the same evening came to Samuel M. McClure's residence and witnessed the execution of the paper. When all these parties met together, Robert Neely requested Samuel M. McClure to read the paper aloud in their presence. He did so, and at the conclusion of the reading the paper was executed. In the course of the afternoon, and before signing, Mr. Neely told Miss McClure that the purport of the agreement was, that he released all claim to her property, and she gave up all right to his property. In the course of the conversation the amount of the annuity was talked of, when she designated it as a very mean sum, as it would hardly pay her board. There appears to have been a good deal of conversation on the subject between the parties during the afternoon. She does not appear to have appealed to either of her brothers, or her uncle, for any advice on the subject, and they did not give her any. Her brother Samuel appears to have gone so far as to say to her that they two were old enough to attend to their own business, and she could do as she pleased about it. He understood at the time the force and effect of the paper. Mr. Neely informed her, that if the paper was not executed it would upset all his plans. Samuel M. McClure appears to have had very little business experience, and no knowledge as to deeds, contracts, or wills. His business at that time was farming. He had not been consulted by Mr. Neely as to acting as trustee for his sister, nor did he know such was the intention until he read the paper that afternoon. He filled in the necessary blanks before it was executed. He was a man of forty-five years of age, while his brother Joseph was several years older. James McClure was over seventy years of age. Joseph M. McClure was then in business, and

Decision of Court below.

had been in business for many years. At the time the paper was executed, nothing was said by Mr. Neely as to the amount or character of his estate.

Do these additional facts show that the contract in question was executed in fraud of Elizabeth M. Neely's rights, or under such duress as should relieve her from its operation?

It is true, no disclosure of the property of either was made at the time the contract was executed, but the parties had known each other for years; they were cousins, and had lived but a few miles apart. Mr. Neely was about sixty years of age, and well known in the neighborhood as a successful business man, with the reputation of being well off. While it is true that this general information may not be sufficient to prove she had knowledge, approximating correctness, of the value of his property, still we can hardly believe Miss McClure was deceived as to his estate because of his silence. We now find that her estate was then worth about one fourth of his, and that in this respect the contract was a fair and reasonable one, as she would inherit but one third of his estate. She criticised Mr. Neely's offer of an annuity of six hundred dollars, after his death, as a mean offer, thereby indicating that she believed him able to do something better if he was so disposed. She was surrounded at the time by relatives, who must have had some knowledge of Mr. Neely's circumstances, and who would have known, and remonstrated against any deception on his part, in this particular.

While Mr. Neely appears to have been firm in his purpose to have an ante-nuptial contract executed, and while it might have been with propriety suggested at an earlier day, still we are unable to see any fraud practiced upon her. He not only made known to her at the time his wishes, but consulted with her brother upon the subject, in her presence. He explained to her the purport of the instrument, and told her that by its terms he released all right to her property, and she gave up all right to his, and in addition to this, he was to secure her the sum of six hundred dollars annually, in the event of his dying first. He called upon her brother and uncle to witness the transaction, and in their presence requested another brother to read over the agreement, so that all might hear it. This was done, and after all had an opportunity of considering it, it was exe-

cuted. We cannot doubt she understood the import of the paper, for she did not then appeal to any of them for advice. Some three or four hours elapsed from the time Mr. Neely made known his wishes, until the paper was executed. It is manifest that her feelings were hurt, and she was annoyed that such a demand should be made upon her, but we cannot believe she was deceived or that a fraud was practiced upon her.

Neither can we say that Mr. Neely's importunities and firmness amounted to duress. It is true, he told her that her refusal would disarrange all his business plans, and if she did not sign the paper there would be no wedding. This expression was used about three o'clock in the afternoon, and the contract was not signed until about seven. In the mean time the whole matter had been discussed, not only by the intimate parties to it, but by her brother and uncle. We can hardly believe that they would stand by and see her reluctantly forced into an unfair marriage contract, rather than have the invitations then out, recalled. Such a thing might have been mortifying, but that is easier to bear than injustice. While we may condemn his gallantry, we cannot say she was deprived of a free choice. She certainly did not yield because of the confidence in him, engendered by the betrothal, nor did he abuse the influence which the engagement gave him, for she notified all present that her action was the result of a wish to avoid the disgrace to the family by calling in the invitations to the wedding. She was given a free choice and she exercised it, after due consideration. The alternative presented for her consideration might have been an unpleasant one, but we cannot say it was legally unreasonable, or unjust. It would not be proper now to allow her to repudiate her election because she may think that, by reason of present circumstances, she then made a mistake.

The constraint which takes away free agency, and destroys the power of withholding assent to a contract, must be one which is imminent, and without immediate means of prevention; and be such as would operate on the mind of a person of reasonable firmness of purpose. A threat to withhold payment of a debt, or to refuse performance of a contract, or to do an injury which may at once be redressed by legal proceedings, will not amount to duress per minas. The power of mind necessary to give assent to a contract is the same in law and equity. A

chancellor, it is true, will refuse his aid to enforce specific per-
formance of a contract, for a reason less than that constituting
duress per minas, or will set aside a bargain for extortion, or
undue influence operating upon a weak mind, or under circum-
stances of a confidential relation; yet the rule in equity seems
to be, that where a party is a free agent and is equal to pro-
tecting herself, the court will not interfere: Miller v. Miller,
68 Pa. 493; Brightley's Equity, § 74.

We are unable to find from these additional facts any rea-
son why a chancellor should interfere in this case, and why he
should decline to enforce the contract in question, and, there-
fore, upon the whole case we are compelled to refuse the
prayers of the petitioner.

The court having signed a final decree dismissing the peti-
tion at the costs of the estate of Robert Neely, deceased,—the
order as to costs being entered by consent of the executors of
the estate, the petitioner took this appeal, specifying that the
court erred:

1. In holding that Samuel M. McClure, the trustee in the
alleged marriage contract, was an incompetent witness, and in
excluding his testimony.

2. In holding that there was neither active nor constructive
fraud practiced upon Elizabeth M. McClure in obtaining her
signature to the contract, and that it is binding upon her.

3. In holding that the facts established by the testimony of
Samuel M. McClure (treating him as a competent witness) do
not show that the contract was executed in fraud of Elizabeth
M. McClure's rights, or under such duress as should relieve
her from its operation.

4. In refusing the prayer of the petitioner and in dismissing
her petition.

*Mr. George Junkin* (with him *Mr. Joseph De F. Junkin* and
*Mr. R. T. Cornwell*), for the appellant:

1. The witness in this case was not a party to the record;
he was merely a nominal party to the original instrument.
He had then and has now, no interest, not even for costs. He
was a competent witness at common law; and the acts of
1869 and 1887 did not disqualify him: 2 Starkie on Ev., 3d

Am. ed., 786; Drum v. Simpson, 6 Binn. 481; Harvey v. Alexander, 1 Rand. 219 (10 Amer. D. 519); Taylor v. Moore, 2 Rand. 563; Hawkins v. Hawkins, 2 Car. L. R. 267; 1 Greenl. Ev., § 333, n. 2; § 409, n. 3; Middletown S. Bank v. Bates, 11 Conn. 519; Steele v. Phoenix Ins. Co., 3 Binn. 306; Patton v. Ash, 7 S. & R. 116; Shrom v. Williams, 43 Pa. 520; King v. Cloud, 7 Pa. 467; Craig v. Brendel, 69 Pa. 153; Ryerss v. Presb. Cong., 33 Pa. 114; Keim v. Taylor, 11 Pa. 163; Cox v. McKean, 56 Pa. 243; Sheetz v. Hanbest, 81 Pa. 100; Hoskinson v. Miller, 104 Pa. 175; Gamble v. Hepburn, 90 Pa. 439; Good v. Calvert, 1 Penny. 140; Burrell v. Uncapher, 117 Pa. 353; Strawn v. Shank, 110 Pa. 259; Ridgway v. Longaker, 18 Pa. 215; Hay's App., 91 Pa. 265.

2. The subject raised in the present case has so recently been before this court in Shea's App., 121 Pa. 302, that an extended discussion of the law and facts is unnecessary. As in that case, so here, " in point of fact the plaintiff did execute a release of dower when she was sui juris, and it is obligatory upon her unless there are sufficient legal or equitable reasons apparent on the record for denying its obligatory force." The respondents have formally pleaded this release or marriage contract, and it is for them to maintain it. It is not enough for them to prove merely the execution of the contract: they must go further and show the " righteousness " of it. They have proved nothing, while the petitioner's proof shows that the contract was a trick and a fraud, and signed under such circumstances as to amount to duress, and legal as well as actual fraud. It is submitted that the contract was executed under such circumstances that it ought not to stand as a defence against the rights in the estate of her husband with which the law clothes every wife: Shea's App., 121 Pa. 302; Miskey's App., 107 Pa. 611; Darlington's App., 86 Pa. 512; Huffman v. Iams, 9 Cent. R. 813; Jordan v. Elliot, 12 W. N. 56; Williams v. Bagley, L. R. 1 H. L. 200; Miller v. Miller, 68 Pa. 493; Pierce v. Pierce, 71 N. Y. 154 (27 Amer. R. 22); Taylor v. Rickman, 1 N. C. 278; Woodward v. Woodward, 5 Snead. 49; Sears v. Shafer, 6 N. Y. 268; Nesbit v. Lockman, 34 N. Y. 167; Huguenin v. Baseley, 14 Ves. 274; Hoghton v. Hoghton, 15 Beav. 299; Boyd v. De La Montagnie, 73 N. Y. 498 (29 Amer. R. 197); Wheelan v. Wheelan, 3 Cow. 576; Pri-

deaux v. Lonsdale, 1 DeG., J. & S. 431 ; Boyd v. Boyd, 66 Pa.
283 ; Cuthbertson's App., 97 Pa. 163 ; Rhodes v. Bate, L. R.
1 Ch. App. 259; Turner v. Collins, L. R. 7 Ch. App. 329; Cooke
v. Lamotte, 15 Beav. 241 ; 1 Story Eq. J., 308 ; Kline's Est.,
64 Pa. 122 ; Tiernan v. Binns, 92 Pa. 248 ; Bierer's App., 92
Pa. 265 ; Ludwig's App., 101 Pa. 535; Smith's App., 115 Pa.
319.

*Mr. R. Jones Monaghan* (with him *Mr. J. Frank E. Hause
and Mr. H. T. Fairlamb*), for the appellees :

1. No case has yet been decided, of which we know or to
which we have been referred, which asserts the doctrine that in all
cases and under all circumstances, where an ante-nuptial con-
tract or release of dower is produced against the wife or widow,
as a defence to a suit brought by her, without more, there arises
a presumption that her husband has wronged her in the pro-
curement of the same.   All the cases agree that the ground
must be laid ; that it must be shown that the intended husband
plainly obtained the advantage in the contract, as that the pro-
vision for the wife was disproportionate to his means.   If this is
not made to appear on behalf of the wife, the contract stands
without any occasion in the first instance, on the part of the hus-
band, to show that he did not cheat his wife : Shea's App., 121
Pa. 392 ; Linton's App., 104 Pa. 228 ; Hafer v. Hafer, 33 Kan.
462 ; Smith's App., 115 Pa. 319.

2. All the cases cited on the other side upon this point were
cases of gifts, or voluntary conveyances, or at least where the
only consideration was the technically valuable one of marriage.
The case in hand was a contract for a valuable consideration,
fully carried out and enjoyed by both parties for a period
of more than ten years prior to Mr. Neely's death.   Even in
will cases, where there is no valuable consideration for the gifts,
undue influence must be such as subjugates the mind of the tes-
tator to the will of the person operating upon it : and, to estab-
lish this, proof must be made of some fraud practiced, some
threats or misrepresentations made, or some physical or moral
coercion employed, so as to destroy the free agency of the tes-
tator : Tawney v. Long, 76 Pa. 115 ; Eckert v. Flowry, 43 Pa.
51 ; McMahon v. Ryan, 20 Pa. 329.   Much more forcibly do
they apply to the case of a solemn contract for a valuable con-

sideration then passing to both contracting parties: Miller v. Miller, 68 Pa. 493; Union N. Bank v. Dersham, 15 W. N. 542; Peck v. Peck, 12 R. I. 485 (34 Amer. R. 702).

3. At common law the trustee was not a competent witness: Swanzey v. Parker, 50 Pa. 455; 1 Greenl. Ev. § 354; Frear v. Evertson, 20 Johns. 143; People v. Irving, 1 Wend. 20; Graves v. Griffin, 19 Pa. 177; Alcorn v. Cook, 101 Pa. 214; Carey v. Fairchild, 19 W. N. 411. He is not competent under the statute: Ash v. Guie, 97 Pa. 493; John v. Pardee, 109 Pa. 545; Fross' App., 105 Pa. 265; Tintsman v. Croushore, 104 Pa. 197; Karns v. Tanner, 66 Pa. 305; Murray v. Railroad Co., 103 Pa. 44. But, waiving the trustee's competency as a witness, there is here only the testimony of one witness to set aside the solemn paper writing signed by both parties, vouched for as genuine by the very witness and party to it who now attacks it and further witnessed and approved by two other near relatives of the party now assailing it. It is not asking too much, to ask that this shall not be lightly done: Nedby v. Nedby, 5 DeG. & Sm. 377; Juniata B. Ass'n v. Hetzel, 103 Pa. 514; Bertsch v. Railroad Co., 4 R. 139; Herner v. Railroad Co., 1 Pa. C. C. 43; Updegrove v. Railroad Co., 3 Pa. C. C. 74; N. & W. Br. Ry. Co. v. Swank, 105 Pa. 561; Campbell v. Patterson, 95 Pa. 453; Murray v. Railroad Co., 103 Pa. 44; Phillips v. Meily, 106 Pa. 537. This is not a question of equity pleading. It is simply and only a question of the weight of testimony required in equity to move a chancellor to set aside a solemn writing.

OPINION, MR. CHIEF JUSTICE PAXSON:

The appellant in this case is the widow of Robert Neely and she seeks to set aside the ante-nuptial contract between them upon the ground that it is in fraud of her rights as widow and was extorted from her unwillingly. At the time she married Robert Neely the latter was a widower of about sixty years of age, had been twice married, and had issue living by each wife. The appellant was a spinster over fifty years of age. She had an estate of $12,000; her husband had an estate several times larger. They were cousins, and after a short courtship entered into an engagement of marriage. A few days before the time appointed for the marriage, after

the cards were out and a caterer engaged, Mr. Neely called upon his betrothed with an ante-nuptial contract, prepared by his attorney, in which he relinquished all claim upon her estate, and covenanted to give her six hundred dollars per annum after his death in full of all claim by her upon his estate. No disclosure appears to have been made by either as to the extent of his or her estate. The appellant objected to signing the paper, thought it was mean, and shed some tears. Mr. Neely was a keen, shrewd, firm, business man, and told her "If you don't sign it there will be no wedding." Before the execution of the paper, however, he called in her nearest relatives, her uncle and two brothers; and the paper was fully read over and explained to her. One of her brothers was named as trustee in the contract. She does not appear to have asked any of them for advice. Several hours elapsed between the time Mr. Neely made known his wishes and the execution of the paper. She finally signed it. They lived together for some ten years, when her husband died, and by his will made a provision for the payment of the annuity of six hundred dollars, and left her in addition his mansion house and furniture so long as she desired to use it. The court below has found as a fact that there was neither actual nor constructive fraud in the execution of the contract.

It was held in Kline v. Kline, 57 Pa. 120, that the parties to an ante-nuptial contract were not like buyer and seller, dealing at arm's length, but stood in a confidential relation calling for the exercise of the richest good faith, and while it might not be necessary to show affirmatively that there was a full disclosure of the property and circumstances of each, yet if the provision secured for the wife was unreasonably disproportionate to the means of the intended husband, it raised the presumption of designed concealment and threw upon him the burden of proof. This was reiterated in Kline's Est., 64 Pa. 122; in Tiernan v. Binns, 92 Pa. 248; Bierer's App., 92 Pa. 265, and several subsequent cases. It is the well settled law of this state. Shea's App., 121 Pa. 302, is not in conflict with these cases. It appeared in that case, and it is so stated in the opinion of the court, that Mrs. Shea could neither read nor write, and there was no proof that the instrument was read or explained to her, and there was no affirmative proof that

she had knowledge of the paper she signed almost immediately before the marriage was celebrated.

As before remarked neither party disclosed to the other the full extent of their means, at the time the contract was executed. That each knew the other had means is not disputed. In the absence of such disclosure, the law appears to be that if the provision by the husband for his future wife was unreasonably disproportioned to his means, it raises the presumption of designed concealment and throws the burden upon him to show that it was fair. This brings us at once to the question, was the provision for the wife unreasonable under the circumstances?

Before I discuss the facts upon this point, I will refer to one or two of our recent cases. In Ludwig's App., 101 Pa. 535, a widower, fifty-seven years of age, and a poor widow of sixty-three years, being about to marry, executed an ante-nuptial contract, whereby the latter, in consideration of "one dollar, and of a comfortable support during life, and at her death a decent Christian burial," relinquished all her rights in the former's estate. The agreement recited that the intended husband owned "certain lands and tenements, also personal property;" the person who drew the document explained its effect to the woman before execution, and stated that the intended husband "had a large property," but the extent or value thereof was not made known to her. In fact it amounted to over $14,000, and it was held that she was bound by the contract and for this reason was not allowed the widow's exemption of $300. It was said in the opinion of the court: "From a sentimental standpoint the provision for the widow would not seem generous. But a widower of fifty-seven with eleven children, seldom contracts a second marriage from mere sentiment. He may have thought it was enough, in view of her age and position, to give her a comfortable home, a decent support during her life, and a Christian burial after her death. At any rate it is very clear she was of that opinion, and that is an end of the case." In Smith's App., 115 Pa. 319, the ante-nuptial contract gave the wife $1200 a year. His will gave her the income of $15,000 additional, but that is immaterial. The estate of the husband for distribution was $334,-543.83. In that case the appellant was a second wife, past

middle age, and her husband was a widower, with children living by his first wife. We held that the disproportion of the provision for the wife to his means was not so great as to raise a presumption of fraud. There was no disclosure of the extent of the husband's estate.

Was the provision which Mr. Neely made for his intended wife so disproportioned to his means as to create a presumption of fraud or intended concealment? That the appellant knew when she signed the paper that he was a man of large means is clear from the fact that she objected to it on the ground of its meanness. When we consider the question of the adequacy of the provision we must regard all the circumstances surrounding the case. This was a marriage between persons well advanced in years. The appellant was not the mother of his children, nor was she likely ever to bear him any. She had not in any way aided him to accumulate his fortune. She had $12,000 of her own, all of which he relinquished. In additon he gave her $600 per year during her life. What claim had this old woman, marrying this old man, to come in and take one third of his estate away from his children, and yet retain the whole of her own? She would of course have had a legal claim had he married her without an ante-nuptial contract; but she had no claim which made it inequitable or unjust in him to insist upon the execution of the contract before the marriage. It would have been a wrong to his own blood if he had not made some such arrangement. It was not a liberal provision, but it was adequate. She retains all of her own estate, and has now in addition $600 per year, besides a comfortable furnished home. Surely her last condition is better than her first.

There is a marked distinction between this case and that of a young couple just entering upon the voyage of life. In the latter instance they grow up together; the wife is the mother of his children; she shares his burdens in his early struggles, and often by her thrift and economy materially aids him in the accumulation of his fortune. To cut off such a wife with a mere support during life would be as unjust as it would be ungenerous. But when a man in the decline of life, who has been twice a widower, and who has two sets of children, for the third time leads a woman to the altar, and an elderly woman

at that, it is very different. In such case the wife reaps where she has not sown, and if she is provided with a comfortable support after her husband's death she has no just cause of complaint. In any event, if she is dissatisfied she ought to refuse to sign the contract, and not accept its benefits during her husband's life, and then seek to repudiate it after his death.

We need not consider the question of duress. She did not sign willingly; she was as thrifty a woman as he was a man, and did not resign the hope of acquiring a considerable estate to leave to her own blood without shedding a few tears: but she was not coerced; she did not sign under legal duress.

I have not discussed the competency of Samuel M. McClure as a witness. His testimony, if competent, could not change the result.

> The decree is affirmed, and the appeal dismissed at the costs of the appellant.

Mr. Justice Sterrett dissents: