## Kline *versus* Kline.

1. The relation of persons betrothed to each other is one of unbounded confidence, especially on the part of the woman; they are not in the same category with buyers and sellers, and are not dealing with each other at arms length.

2. When parties are about to marry and to enter into an ante-nuptial contract in relation to their estates, it is the duty of each to be frank and unreserved in the disclosure of all circumstances bearing on the contemplated agreement.

3. Any designed and material concealment ought to avoid such contract, at the will of the party injured.

4. In an issue to try the validity of a marriage contract the judge charged: "The woman was bound to exercise her judgment and take advantage of the opportunity that existed to obtain information; if she did not do so, it was her own fault. The parties were dealing at arm's length." *Held*, to be error.

January 21st 1868.   Before Thompson, C. J., Read, Agnew and Sharswood, JJ.   Strong, J., at Nisi Prius.

Error to the Court of Common Pleas of *Montgomery county:* To January Term 1868.

This was an issue between Samuel Kline and Dillman Bean, plaintiffs, and Ann Kline, defendant, directed by the Orphans' Court to try the validity of a marriage contract between the defendant and Gabriel Kline, now deceased. After Kline's death in 1867, his heirs interposed the contract as a bar to Mrs. Kline's claim for a share of his estate as widow.

On the trial before Chapman, P. J., the plaintiffs gave in evidence the contract, dated March 21st 1850, between Gabriel Kline of the first part, Ann Hendricks of the second part, and George Detweiler of the third part. It recited an intended marriage between Kline and Miss Hendricks, that Kline was seised of a dwelling-house and tract of land then occupied by him, and that Miss Hendricks was "possessed of certain effects and property;" and it was agreed between Kline, Miss Hendricks and Detweiler, acting as her trustee, that in case of the marriage and of Miss Hendricks surviving her husband, she should during her life, have the north end of the dwelling-house, the kitchen, one room and entry on the second floor, half the garret, cellar and garden, and $40 dollars per annum out of his estate; all the property belonging to her at her marriage to remain her own.

The instrument was executed by the three parties, Miss Hendricks signing by her mark, and it was duly acknowledged.

The defendant then gave evidence, that at the execution of the agreement, nothing was said of what property Kline owned, nor about Miss Hendricks's property; the agreement was read—she did not speak English; it was stated what rights she had. The inventory of Kline's personal estate amounted to $8991.45; ten

[Kline *v.* Kline.]

lots of real estate which he owned at the time of the marriage sold for $6369. The dwelling-house and lot were valued at $800.

The court charged:—

"The question involved in this case is, whether an antenuptial agreement entered into between Gabriel Kline and the defendant, on the 21st of March 1850, is valid. It is contended by defendant, that a confidential relation existed between Gabriel Kline and her, and that it was incumbent on the plaintiffs to show that Gabriel Kline fully informed her of the amount and extent of the property owned by him before the execution of the agreement; otherwise there can be no recovery by the plaintiffs.

"The defendant's position is incorrect. The woman was bound to exercise her judgment, and take advantage of the opportunity that existed to obtain information; if she did not do so, it was her own fault. The parties were dealing at arm's length. He was not bound to disclose to her the amount or value of his property.

"Your verdict will therefore be for the plaintiffs, if you believe the evidence."

The verdict was for the plaintiffs; the defendant took a writ of error, and assigned the charge of the court for error.

*C. Hunsicker* and *G. R. Fox*, for plaintiff in error, cited 1 Story's Eq., §§ 187, 189, 217–222, 270–271, 308.

*D. H. Mulvany* (with whom was *B. M. Boyer*), for defendant in error, cited 1 Story's Eq., § 218; 2 Id. §§ 1368, 1519; Cannel *v.* Buckle, 2 P. Wms. 243, 244.

The opinion of the court was delivered, January 28th 1868, by

SHARSWOOD, J.—Upon a question arising in the Orphans' Court as to the right of the widow of Gabriel Kline to any share of his estate, an issue was directed to try the validity of an antenuptial contract between her and the intestate, dated March 21st 1850, by which it seems to have been assumed that she had by anticipation renounced or released all her rights as widow. Whether the instrument does bear that meaning is a question which does not arise on this record, has not been argued, and upon it, we desire to be understood, there is no opinion either expressed or to be implied in the judgment we now enter. The deed was executed by the parties a very short time before their marriage, and it was alleged on behalf of the widow that the circumstances of her intended husband were concealed from her and misrepresented in the writing itself, in consequence of which she was induced for a very inadequate consideration to subscribe it. Evidence tending to show this was given. It was contended on her part, that it was incumbent on the plaintiffs in the issue to show that Gabriel Kline fully informed her of the amount and extent of the property

owned by him. Had the judge contented himself with giving a simple negative to this proposition, it would perhaps have been unexceptionable. But his charge was much broader, for he instructed the jury that, "the woman was bound to exercise her judgment and take advantage of the opportunity that existed to obtain information; if she did not do so it was her own fault. The parties were dealing at arm's length. He was not bound to disclose to her the amount or value of his property." This part of the charge was excepted to and is assigned for error.

There is perhaps no relation of life in which more unbounded confidence is reposed than in that existing between parties who are betrothed to each other. Especially does the woman place the most implicit trust in the truth and affection of him in whose keeping she is about to deposit the happiness of her future life. From him she has no secrets; she believes he has none from her. To consider such persons as in the same category with buyers and sellers, and to say that they are dealing at arm's length, we think is a mistake. Surely when a man and woman are on the eve of marriage, and it is proposed between them, as in this instance, to enter into an antenuptial contract upon the subject of "the enjoyment and disposition of their respective estates," it is the duty of each to be frank and unreserved in the disclosure of all circumstances materially bearing on the contemplated agreement. It may perhaps be presumed in the first instance that such disclosure was made, but any designed and material concealment ought to avoid the contract at the will of the party who has been injured. Neither Judge Story nor any other elementary writer has pretended to give an exhaustive catalogue of those confidential relations which require the utmost good faith (*uberrima fides*) in all transactions between the parties: 1 Story's Eq. § 215. That distinguished jurist, in commenting upon the class of cases in which secret and underhand agreements, in fraud of marital rights, have been relieved against in equity, remarks, that while they are meditated frauds on innocent parties, and upon that account properly held invalid, yet that the doctrine has "a higher foundation, in the security which it is designed to throw round the contract of marriage, by placing all parties upon the basis of good faith, mutual confidence and equality of condition:" 1 Story's Eq., § 267.

If, indeed, this agreement was intended to debar the wife of all future right to any share of her husband's estate in case she survived him, it was a most unequal and unjust bargain. It holds out the idea in the recital that his only property was the house and lot he then occupied, while the jury might have inferred from the evidence that he was worth at that time ten times its value. It bestows on her a portion of the house for life, with her own household goods which she owned before mar-

riage, and the small annuity of $40 a year or about 11 cents a day to feed and clothe her, to find medical attendance and nursing for her when sick, and to bury her decently when she died. If, as has happened, she should find herself a solitary widow, without children, at the advanced age of seventy, such a pittance leaves her to be an object of private charity or public relief. To say that she was bound when the contract was proposed to exercise her judgment, that she ought to have taken advantage of the opportunity that existed to obtain information, and that if she did not do so it was her own fault, is to suggest what would be revolting to all the better feelings of woman's nature. To have instituted inquiries into the property and fortune of her betrothed, would have indicated that she was actuated by selfish and interested motives. She shrank back from the thought of asking a single question. She executed the paper without hesitation, and without inquiry. She believed that he would propose nothing but what was just, and she had a right to exercise that confidence. She lived with him seventeen years, for aught that appears, as an affectionate and faithful helpmeet, and no doubt largely assisted in accumulating the fortune—at least of $15,000—of which he died in possession according to the evidence. We think there was error in the charge, and accordingly

Judgment reversed, and *venire facias de novo* awarded.