## Zeigler Estate.

Argued March 18, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Daniel M. Evans,* with him *R. Clifton Hood,* for appellant.

*Robert L. Orr,* with him *Clyde Holt* and *Reed, Ewing & Ray,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 19, 1955:

This is an appeal from a decree of the Orphans' Court of Beaver County annulling the election of Elizabeth K. Zeigler, widow, to take against the will of her deceased husband, William Zeigler. The circumstances leading up to the litigation are briefly related. In the year 1951, William Zeigler, then 74 years of age, and Elizabeth K. Anderson, 69 years of age, decided to spend their declining years together as man and wife. Each had been previously married and thus knew from experience that the marital relationship has to do with certain matters of finance as much as it has to do with romance. Accordingly they discussed their respective monetary standing and agreed that they would hold on to their individual fortunes and that neither would expect or claim any benefit from the estate of the party who died first. This agreement took the solemn form of a contract entered into on March 21, 1951, in the office of the attorney for William Zeigler. The contract fully disclosed the real and personal property held by both parties, except that Mrs. Anderson did not state that she was receiving at the time social security benefits at the rate of $46.80 per month.

Elizabeth Anderson and William Zeigler married on April 4, 1951. The record does not disclose, nor is it relevant to the disposition of the case, whether the marriage was a happy one or not. It endured only two years, William Zeigler departing this life on May 25, 1953.

When Mrs. Anderson married Zeigler, she was taken off the social security rolls; when he died, she was reinstated but at the rate of only $18.80 per month. Upon her husband's death she filed a petition for family exemption and an election against the will to regain in some manner the financial prop she had now lost. The executor of Zeigler's estate pleaded the antenuptial contract which the Court below decreed was fully binding upon the widow.

Mrs. Zeigler claimed in the Court below, as she does here, that since she was not advised of the effect the remarriage would have upon her social security status, the agreement made is not binding upon her. She admits in her brief that there was no attempt on the part of her husband to mislead her, or that there existed any plan to commit a fraud upon her. In fact she states that "her late husband was a man of honor who intended to treat her fairly." Her complaint is that no one informed her that upon her remarriage she would have to give up the $46.80 per month she was receiving as social security and that upon her husband's death she would receive from that source only $18.80 per month. But there is nothing in the record to show that Zeigler was acquainted with her social security position, since she made no reference to it when outlining her financial resources. At the time the agreement was drafted Zeigler's attorney said to Mrs. Zeigler: "You had better take this contract to an attorney and be advised by him." She replied that she did not need to consult an attorney.

Before the premarital compact was signed, Mr. Zeigler frankly informed his intended spouse that he owned real property in the value of $10,000 and personal property valued at $30,000. She thus knew that if she signed the agreement she gave up her right to any portion of that $40,000. On her part she stated that she owned real property in the value of $8,000 and personal property in the amount of $10,500. It was a simple matter of arithmetic for her to perceive that his worldly goods in the scale of monetary appreciation exceeded hers so that on the basis of an equal quid pro quo she was giving up more than he was, so far as participation in each other's estate was concerned. It probably appeared to her that even with this disparate postmortem exchange she would be the gainer since she would during his lifetime be supported by him and would enjoy his home and all other advantages accruing from his superior financial status.

Although Mrs. Zeigler contends that the antenuptial agreement does not comply with the law of contracts she fails to point out wherein that failure appears. She quotes from the case of *Kline v. Kline,* 57 Pa. 120: "There is perhaps no relation of life in which more unbounded confidence is reposed than in that existing between parties who are betrothed to each other. Especially does the woman place the most implicit trust in the truth and affection in him in whose company she is about to deposit the happiness of her future life." This is good expression of good law, but Mrs. Zeigler has not shown wherein it was violated in any way in the instant case, since she has stated a number of times that there was no purposeful or even inadvertent withholding of the truth by Mr. Zeigler in his relations with her.

Mrs. Zeigler seeks a repudiation of the agreement on the basis of a supposed "mutual mistake," but the

record is barren of any supposed mutual mistake. In the case of *First Nat. Bank v. Rockefeller et al.,* 333 Pa. 553, 559, this Court said: ". . . however the general rule may have been criticized in the past, the courts of this State are not inclined to depart from its enforcement for the reason, as often stated, that if ignorance or mistake of law were generally allowed to be pleaded, 'there could be no security in legal rights, no certainty in judicial investigations, no finality in litigation.' " While there are exceptions to the general rule here cited, the appellant has not advanced any factual situation upon which to base such an exception. A study of the record reveals that there was simply no foundation upon which the Court below could possibly found a nullification of the antenuptial contract. This type of agreement depends for its validity upon one of two factors: a reasonable provision for the wife, or in the absence of such a provision, a full and fair disclosure to the wife of the husband's worth. (*McClelland Estate,* 365 Pa. 401). There was no failure here at a fair and full disclosure on the part of the husband.

It is not apparent, as the appellant claims, that the agreement was unfair and unconscionable. Speaking on the subject of antenuptial contracts, Chief Justice PAXSON said in the case of *Nelley's Appeal,* 124 Pa. 406, 426: "There is a marked distinction between this case and that of a young couple just entering upon the voyage of life. In the latter instance they grow up together; the wife is the mother of his children; she shares his burdens in his early struggle, and often by her thrift and economy materially aids him in the accumulation of his fortune. To cut off such a wife with a mere support during life would be as unjust as it would be ungenerous. But when a man in the decline of life, who has been twice a widower, and who has

two sets of children, for the third time leads a woman to the altar, and an elderly woman at that, it is very different. In such case the wife reaps where she has not sown, and if she is provided with a comfortable support after her husband's death she has no just cause of complaint. In any event, if she is dissatisfied she ought to refuse to sign the contract, and not accept its benefits during her husband's life, and then seek to repudiate it after his death."

The Wills Act which protects a widow from any attempt on the part of the husband to disinherit her is one of the most just and salutary statutes in the books because it throws a cloak of security around the woman who is deserving of protection after long years of faithful service at her husband's side. If there were anything savoring of injustice and ingratitude in this case by the way of a man's dismissing his conjugal mate just as they were both about to enter the port of comfort and security after many years on the ocean of adversity, struggle, and sacrifice, some argument could be made with regard to whether or not the Zeigler agreement was a fair and conscionable one. But there is nothing like that here. The voyage was about done, the ship was almost ready for dry dock when William Zeigler took Elizabeth Anderson aboard. Zeigler may well have felt that he owed something to his three children who had helped to man the family vessel on its long journey. Mrs. Zeigler knew of these children before she took passage on her husband's ship. At no time was there the slightest suggestion of concealment of facts from her by her husband.

.. That Mrs. Zeigler has lost, through a change in her social security status, the amount of $28 per month is scarcely enough reason to invalidate a contract into which she entered most voluntarily. She was a person of education, she had been previously married 32 years,

she was in reasonably good health at the time, she indicated her occupation to be that of stenographer. All this would spell out an intelligence well able to comprehend the contract she signed. Nor does she complain that she did not understand any of its simple provisions.

Under all these circumstances, this Court cannot do other than affirm the decree entered below.

Decree affirmed; costs to be divided equally.