## Gelb Estate.

118

Argued November 16, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused April 28, 1967.

*James Francis Lawler*, with him *Ostroff & Lawler*, for appellants.

*Edward M. David,* with him *Saul, Ewing, Remick & Saul,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, March 21, 1967:

This appeal involves the validity of an antenuptial agreement signed by the decedent, Edward H. Gelb, and his widow, Fannie Bazrod Gelb, on March 24, 1960, three days before their marriage. At the time of their marriage Mr. Gelb, then 67, and Mrs. Gelb, 64, both had adult children from prior marriages. By the terms of the agreement each party renounced his interest in the estate of the other, and Mrs. Gelb received $15,000 in cash.[1] The parties lived together harmoniously from the date of their marriage until the husband's death on June 6, 1963.

On February 28, 1964, Mrs. Gelb filed an election to take against her husband's will; the executors filed a petition to vacate this election. Following a hearing at which the validity of the antenuptial agreement was the sole issue, the auditing judge permitted the widow to take against the will because he found the evidence "convincingly establishes" that: "(1) the decedent materially misrepresented to Fannie Bazrod the value of his estate at the time he induced her to execute the antenuptial agreement; (2) Fannie Bazrod executed the antenuptial agreement in reliance upon the representations which Edward H. Gelb made to her." Exceptions were taken and the matter argued before the Orphans' Court of Philadelphia County en banc. That court unanimously affirmed the auditing judge's adjudication,[2] *Gelb Estate,* 38 Pa. D. & C. 2d 203 (Phila. O. C. 1966), and this appeal followed.

---

[1] Originally Mr. Gelb had proposed to give Mrs. Bazrod $25,-000, but, after consulting members of his family, reduced the amount to $15,000.

[2] The court en banc did make one change in the initial adjudication when it ordered the $15,000 consideration received by

120

Appellants attack the orphans' court's decision on two theories. Relying upon the parol evidence rule and the Dead Man's Statute,[3] they argue that the testimony of Harry B. Berk, Esq., scrivener of the antenuptial agreement, and Mrs. Gelb, should not have been received. They also maintain that in any event the antenuptial agreement is valid and binding because there is no showing of a lack of adequate provision for the widow. We shall consider the evidentiary questions raised first.

With respect to Mr. Berk, appellant's parol evidence objection is based upon the clause in the antenuptial agreement stating that the value of the husband's property had been fully disclosed to the intended wife. Because of the confidential relationship existing between parties to an antenuptial agreement, which requires from each the highest degree of good faith, such a declaration is only prima facie evidence, rebuttable by extrinsic evidence, *Snyder Estate,* 375 Pa. 185, 188, 100 A. 2d 67, 68 (1953); *McClellan Estate,* 365 Pa. 401, 406, 75 A. 2d 595, 597 (1950). Accordingly, under the parol evidence rule, Mr. Berk's testimony was properly admitted to substantiate claimant's allegations of material misrepresentation contained in her answer to the petition to strike the election. *Myers v. Rubin,* 399 Pa. 363, 366-67, 160 A. 2d 559, 561 (1960); *LaCourse v. Kiesel,* 366 Pa. 385, 390-91, 77 A. 2d 877, 880-81 (1951). Whether Mr. Berk's testimony supports the conclusion of the court below that there was clear and convincing evidence of misrepresentation, see *Palone v. Moschetta,* 387 Pa. 386, 392, 128 A. 2d 37, 40 (1956), is not, in this context, relevant to the question of its admissibility.

Mrs. Gelb to be credited to her portion of the distributive share of the estate. This was done with the auditing judge's express approval.

[3] Act of May 23, 1887, P. L. 158, §5(e), 28 P.S. §322.

One of the conditions which must be met before a witness can be properly disqualified under the Dead Man's Statute is that the interest of the witness, not simply his testimony, be adverse to the decedent. *Hendrickson Estate,* 388 Pa. 39, 45, 130 A. 2d 143, 146-47 (1957). Even if we were to accept exceptant's assumption that Mr. Berk was receiving a fee as "co-counsel", an assumption not supported by the record, such an interest would not render him incompetent but would merely affect his credibility. In order to be adverse the interest must be one from which the witness will either gain or lose as the direct legal operation and effect of the judgment. *Commonwealth Trust Co. v. Szabo,* 391 Pa. 272, 281-82, 138 A. 2d 85, 89 (1957); *Gaston Estate,* 361 Pa. 105, 62 A. 2d 904 (1949); *Dillon's Estate,* 269 Pa. 234, 111 Atl. 919 (1920). For example in *Gaston Estate,* supra, we held that a guardian was a competent witness even though his commissions would be increased, if his contention on behalf of his minor wards was successful.[4]

When Mrs. Gelb was called, exceptants objected to her testifying under the Dead Man's Statute. Claimant agrees that she was initially incompetent to testify, *Snyder Estate,* 375 Pa. 185, 100 A. 2d 67 (1953), but views her testimony as coming within the ambit of the Act of June 11, 1891, P. L. 287, §1, 28 P.S. §325.[5]

---

[4] Because of Mr. Berk's illness, the court convened at his apartment for the purpose of taking his testimony, where he was subjected to lengthy direct and cross-examination. No objection was entered with respect to his testimony until the next hearing a month later. Hence the failure to object would be an alternative ground for sustaining the ruling of the auditing judge. See *McGary Estate,* 355 Pa. 232, 236, 49 A. 2d 350, 352 (1946); *Hughes v. Bailey,* 202 Pa. Superior Ct. 263, 267-68, 195 A. 2d 281, 283-84 (1963).

[5] "Hereafter in any civil proceeding before any tribunal of this Commonwealth . . . although a party to the thing or contract in action may be dead . . . nevertheless any surviving or remain-

Under this exception to the Dead Man's Statute when the party representing the decedent calls a witness who testifies adversely to the interests of the surviving party about a transaction which occurred in the presence of the survivor and the witness, the surviving party is rendered competent to testify in contradiction of said witness. *Commonwealth Trust Co. v. Szabo,* 391 Pa. 272, 283-84, 138 A. 2d 85, 90 (1957) ; *Bowman's Estate,* 301 Pa. 337, 342-43, 152 Atl. 38, 40 (1930). We are fully satisfied that the auditing judge was aware of the limitations placed upon Mrs. Gelb's ability to testify and that he properly limited her to relevant matters concerning conversations which actually took place in her presence and about which there had been previous adverse testimony. See *Bowman's Estate,* supra.[6]

We turn next to a consideration of the validity of the antenuptial agreement itself. While antenuptial agreements are presumptively valid, they, nevertheless,

---

ing party to such thing or contract or any other person whose interest is adverse to the said right of such deceased or lunatic party, shall be a competent witness to any relevant matter, although it may have occurred before the death of said party or the adjudication of his lunacy, if and only if such relevant matter occurred between himself and another person who may be living at the time of the trial and may be competent to testify, and who does so testify upon the trial against such surviving or remaining party or against the person whose interest may be thus adverse, or if such relevant matter occurred in the presence or hearing of such other living or competent person." Act of June 11, 1891, P. L. 287, §1.

[6] Appellants also contend that they did not receive a fair hearing below because the auditing judge suggested to claimant's counsel that Mrs. Gelb be called after counsel had initially rested his case. There is no merit in this contention. *Weiss Will,* 366 Pa. 456, 458-59, 77 A. 2d 422, 423 (1951) ; *Gerlach Estate,* 364 Pa. 207, 214-15, 72 A. 2d 271, 275 (1950). Nor is there any merit in the suggestion that the auditing judge was an advocate for claimant rather than an impartial trier of facts.

depend upon there being either a reasonable provision made for the wife, or, in the absence of such a provision, a full and fair disclosure to the wife of the husband's worth. *Kaufmann Estate,* 404 Pa. 131, 136, 171 A. 2d 48, 50 (1961). When the person attacking the agreement has shown that it was made on the basis of material misrepresentations, it will be presumed that the contract was entered in reliance upon these misrepresentations and the burden to prove otherwise is cast upon the party seeking to uphold the agreement. *McClellan Estate,* 365 Pa. 401, 75 A. 2d 595 (1950).

As the following excerpts from the opinion of the Philadelphia orphans' court en banc demonstrate, the exceptants, in light of these misrepresentations, failed to show that a reasonable provision [7] had been made for the wife: "Harry B. Berk, Esq., scrivener of the antenuptial agreement, testified that decedent stated to him in claimant's presence that his assets were of a value 'in the neighborhood of about $100,000'. This is the same amount that claimant had informed Mr. Berk that decedent had disclosed to her before she and decedent consulted him about the agreement. Mr. Berk urged decedent to give him a written statement of his assets to attach to the antenuptial agreement. When decedent refused to do this, he advised claimant that she would have to rely on decedent's stated valuation of his assets, and *he warned decedent that if this statement of his assets were inaccurate, this might cause the antenuptial agreement to be set aside.* Notwith-

---

[7] The reasonableness of the provision, which is viewed from the date of the agreement, depends upon the particular circumstances of each case. Among the various factors to be considered are: (a) the financial worth of the husband; (b) the financial status of the wife; (c) the age of the parties and the number of children each has; (d) the intelligence of the parties; (e) whether the wife aided in the accumulation of the wealth. See *Kaufmann Estate,* 404 Pa. 131, 137, 171 A. 2d 48, 51 (1961), and cases cited therein.

standing this warning, decedent again refused to set forth his assets in writing, and reiterated that although he had not disclosed to his intended wife 'the nature of his estate', it was worth $100,000 and 'maybe it might be worth $125,000'. In fact, his assets at this time were valued at $263,711, and his daughter, Mrs. Katz, testified that she believed they were then worth $300,000.

"In short, decedent deliberately and grossly understated his assets to claimant as an inducement to her to sign the antenuptial agreement. Claimant relied upon decedent's statement of his assets in executing this agreement. *There is no credible evidence to show that claimant had knowledge that his assets were greater than then stated by him.* Exceptants produced many witnesses and much vague, general testimony to indicate that claimant knew decedent had assets more valuable than those he disclosed to her. *The auditing judge did not believe this evidence; nor do we.* Moreover, such testimony is not sufficient to show knowledge upon the part of claimant which is contrary to decedent's statement of his assets at the time of the execution of the agreement: Kline v. Kline, 57 Pa. 120.

*"Whether claimant would have accepted the $15,000 decedent gave her, if she had known the true value of his estate at the time the antenuptial contract was executed, is not for us to conjecture.* Suffice it to say, she relied upon his statement of his assets. Furthermore, in our opinion, $15,000 is not a proper settlement for a widow who has lived with her husband in her own home for three years, when his estate at the time of marriage and death was in excess of $260,000. Therefore, the antenuptial agreement is voidable: Kaufmann Estate, 404 Pa. 131.

*"Significantly, the widow is very poorly educated.* She testified on cross-examination: 'I can read a little bit. I went to night school for a few seasons'. More-

over, she testified that she did not understand ante-nuptial contracts. But she signed this agreement because decedent wanted her to do so and told her that it was good for both of them. She completely relied upon decedent's representations. Mr. Berk testified: 'I merely asked her if she knew of her intended husband's assets, and she said only from what he told her; and that she was taking his word for it'.

"Pennsylvania has always carefully protected the rights of a widow in her husband's estate, particularly, as in this case, where the husband and wife have lived harmoniously together for years prior to the death of the husband. Therefore, a strong burden was placed upon decedent, who requested his intended wife to re nounce all of her widow's rights, to make a full and complete disclosure of his assets: McClellan Estate, 365 Pa. 401. Decedent did not do this. In fact, he deliberately refused to make a written statement of his assets, and orally stated that his assets were less than one-half what they actually were. It follows that the antenuptial agreement was voidable. Hence, the widow is entitled to take against the will and to receive her share of decedent's estate given to her by the Intestate Act." (Emphasis supplied.) *Gelb Estate*, 38 Pa. D. & C. 2d 203, 205-07 (Phila. O. C. 1966).

The credibility of the witnesses and the weight to be given their testimony is in the first instance to be determined by the auditing judge. His findings of fact, affirmed by the court en banc, like those of a jury, are conclusive unless they are unsupportable by the record. *Collings Estate*, 405 Pa. 280, 282, 175 A. 2d 62, 63 (1961) ; *Pavlinko Estate*, 399 Pa. 536, 541, 160 A. 2d 554, 557 (1960) ; *Hanna Estate*, 383 Pa. 196, 199, 117 A. 2d 730, 732 (1955). The factual conclusions quoted above are amply supported by the record and the application of these facts to the law is in accord with our decisions.

Decree affirmed. Costs on the Estate.

DISSENTING OPINION BY MR. JUSTICE COHEN:

I believe, that under the circumstances of this case, decedent made for his second wife a reasonable provision so that the agreement may not be circumvented, and appellant's petition to vacate claimant's election should have been granted. In *Kaufmann Estate*, 404 Pa. 131, 171 A. 2d 48 (1961), we stated that reasonableness may depend upon various factors: (1) the financial worth of the husband; (2) the financial status of the wife; (3) the age of the parties and the number of children each has; (4) the intelligence of the parties; and (5) whether or not the wife aided in the accumulation of the wealth. The record discloses that when the agreement was signed, decedent was worth approximately $150,000 and had an additional interest in his first wife's unsettled estate of over $112,-000. By the same token while the record does not disclose the precise value of claimant's estate at the time the agreement was signed, the evidence reveals that she was a woman of considerable means. During the month prior to the marriage, claimant told decedent's daughter that she did not need the money she would receive under the agreement because she had plenty of her own. On the same occasion, she and decedent discussed with his daughter the fact that claimant was a wealthy woman in her own right and that she wanted her estate to pass to her children. Further, claimant maintained separate bank and stockbroker accounts and had invested large sums of money. All of her financial matters were conducted separately from those of decedent.

When they married, both parties were in their sixties and had families of their own. The parties were intelligent people, both of whom realized an obligation to their children and grandchildren, and out of love and affection desired their separate estates to pass to the natural objects of their bounties. Accordingly, each in a rational manner relinquished his own

right to share in the estate of the other. Each had accumulated his property without the aid of the other. Neither wished the other to deprive his family of that which he had accumulated over the course of a lifetime. Under the circumstances, I conclude that the sum of $15,000 received by claimant was ample provision and was reasonable by the standard established by this Court. In *Clark's Estate,* 303 Pa. 538, 154 Atl. 919 (1931), we set forth as the test of adequacy of the provision for the wife a consideration of whether or not it is sufficient to enable her to live comfortably, after the husband's death, in the same way as she had previously lived. In the instant case, prior to the marriage, claimant lived in her own home which was clear of mortgage, and which continued as the marital domicil for claimant and decedent. As explained above, the two maintained completely separate and independent financial interests. Claimant's standard of living during the marriage was neither better nor worse than before the marriage. Likewise there is no evidence that it has changed as a result of the death of decedent.

A crucial factor which the orphans' court ignored and which strengthens my conviction that this antenuptial agreement is binding and valid is the mutuality of the promises. Each party agreed to waive his rights in the other's estate in return for a similar covenant. Indeed, this Court has sustained the validity of a prenuptial agreement containing mutual releases against the estate of each spouse even though the agreement made no provision for payment of money or other valuable consideration to the wife and even though the husband's estate was twice as large as that of the wife. *Zeigler Estate,* 381 Pa. 436, 113 A. 2d 271 (1955). In fact, in that case, as a result of the remarriage the wife lost her social security payments of $46.80 per month, and when her husband died about two years

later, her benefits were reinstated at the reduced rate of $18.80 per month. In *Zeigler* the agreement fully disclosed the property held by each spouse, and was valid on that basis alone; however, significantly for its applicability to the instant matter the Court in *Zeigler* recognized that the deceased husband felt a natural obligation to leave his estate to his children and that the wife knew of the children before she entered into the agreement or the marriage.

Furthermore, there is testimony on the record that claimant knew several months before the marriage that decedent was worth about a quarter of a million dollars because his son-in-law had so informed her at a family get-together. Coupling this evidence with the fact that the scrivener of the agreement currently under attack by claimant was her own counsel, I must conclude that she is estopped from maintaining the present action.

Moreover, after the close of testimony the auditing judge so injected himself into the conduct of the case to the detriment of the estate, that at least a new trial should be granted. He insisted that counsel for claimant place her on the witness stand because, as he indicated, his affection and concern for the scrivener necessitated his taking an active part in the conduct of the case.

I dissent.