Vallish Estate.

Argued November 21, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Tom P. Monteverde,* with him *Vincent B. Makowski, Robert E. Bull,* and *Lark, Makowski & Marateck,* and *Schnader, Harrison, Segal & Lewis,* for appellant.

*Gailey C. Keller,* with him *Smith, Eves and Keller,* for appellee.

OPINION BY MR. JUSTICE JONES, August 6, 1968:

This appeal challenges the validity of a decree of the Orphans' Court of Columbia County which, because of the existence of an antenuptial agreement, revoked and vacated an election by a surviving spouse to take against the will of her deceased husband. The sole issue is the validity of that antenuptial agreement.

Walter B. Vallish [decedent], died, testate, on May 14, 1965, survived by Stella Vallish, his widow, three daughters by a prior marriage and several grandchildren. According to the inventory filed, decedent at the time of his death owned realty valued at $10,000 and personalty, including stocks, bonds, a mortgage, bank account, etc., valued at approximately $100,000.

Under the terms of decedent's will, Mrs. Vallish was given an option either (a) to receive $50 monthly until receipt of the total of $5,000 or (b) to live in decedent's residence in Locust Township, Columbia County, "for as long as she desires so long as [the] residence is maintained all year round and so long as she bears responsibility for and pays all maintenance, costs and expenses and keeps the property in a proper state of repair and maintains it in its present condition."[1]

On July 30, 1965, Mrs. Vallish filed an election to take against decedent's will. On January 13, 1966, Dorothy Linnet, a daughter of decedent and decedent's personal representative, joined in by decedent's other daughters, a son-in-law and two grandchildren, petitioned the Orphans' Court of Columbia County for a

---

[1] Mrs. Vallish, up to the filing of the instant appeal, had received nothing from decedent's estate even though the court below had awarded her, on September 26, 1965, a widow's exemption of $1,000.

rule upon Mrs. Vallish to show cause why her election should not be revoked and vacated. This petition was predicated on the fact that on December 3, 1958,—27 days prior to decedent's marriage to Mrs. Vallish—an antenuptial agreement had been executed wherein decedent and Mrs. Vallish each agreed to relinquish any and all claims which each party might have in property then owned or thereafter acquired by the other. The court granted the rule and Mrs. Vallish filed an answer alleging, inter alia, that the antenuptial agreement was invalid because decedent had not fully and fairly disclosed to her the extent and value of his property and that the consideration for the agreement was neither adequate nor reasonable. After several hearings, the court entered a decree revoking and vacating Mrs. Vallish's election to take against the will and from that decree the instant appeal lies.

Mrs. Vallish contends, in substance, that: (1) the finding of the court below that prior to the execution of the antenuptial agreement there had been a full and fair disclosure of decedent's assets lacks evidentiary support; (2) the court erred in excluding from the record proof offered by her of the extent and value of decedent's assets at the time of execution of the antenuptial agreement; (3) the court was biased and prejudiced against her.

The agreement recites, inter alia, that decedent owned certain realty and personalty "the value of which has been fully disclosed to the intended wife", that the prospective Mrs. Vallish owned certain personalty, "the full value of which has been disclosed to the intended husband", and that it was the intention of each party to relinquish any share or interest which either party might acquire, by reason of the prospective marriage, in property then owned or thereafter acquired by the other party. This agreement, *which made no provision whatsoever for the intended*

*wife,* recited as the consideration thereof the marriage, the parties' mutual promises and $1.00. That the agreement was executed by decedent and Mrs. Vallish and witnessed by one Frank Valeski and Howard R. Berninger, the scrivener, is admitted. No schedule of the parties' assets was attached to the agreement.

Decedent and Mrs. Vallish had been previously married, their respective spouses were deceased, and each had children born of such prior marriage; Mrs. Vallish's first husband had come with decedent to this country from Poland; Mrs. Vallish first became acquainted with decedent when she was a ten year old child living in Mount Carmel, Northumberland County; Mrs. Vallish and her first husband had resided for approximately 40 years in Ohio and she and her then husband saw decedent very infrequently during that period; Mrs. Vallish and decedent renewed their acquaintance in July 1958 and, thereafter, until the time of the antenuptial agreement had seen each other only three or four times; at the time of the agreement, Mrs. Vallish was aged 67 and decedent over 70 years.

Recently, our Court has set forth certain criteria for the determination of the validity of antenuptial agreements. In *Gelb Estate,* 425 Pa. 117, 122, 123, 228 A. 2d 367 (1967), we stated: "While antenuptial agreements are presumptively valid, they, nevertheless, depend upon there being either a reasonable provision made for the wife, or, in the absence of such a provision, a full and fair disclosure to the wife of the husband's worth [citing authority]."

In *Kaufmann Estate,* 404 Pa. 131, 171 A. 2d 48 (1961), we held that *an antenuptial agreement is presumptively valid and the burden of proving its invalidity is upon the person who so charges* and we further stated that, in evaluating the reasonableness of the provision made for a wife in an antenuptial agreement, such reasonableness must be determined *as of*

*the date of the agreement* and not by hindsight and that reasonableness depends upon the financial worth of the husband, the financial status of the wife, the age of the parties, the number of children each has, the intelligence of the parties, whether the wife aided in the accumulation of the wealth, etc.

In *Shea's Appeal*, 121 Pa. 302, 318, 319, 15 A. 629 (1888), this Court said: "The relation [between betrothed persons] is one of such extreme mutual confidence that a special duty of full disclosure arises which has no place in the ordinary contractual relation. Thus, in the case of Kline v. Kline, 57 Pa. 120, we said: 'There is perhaps no relation of life in which more unbounded confidence is reposed than in that existing between parties who are betrothed to each other. Especially does the woman place the most implicit trust in the truth and affection of him in whose keeping she is about to deposit the happiness of her future life. From him she has no secrets; she believes he has none from her. To consider such persons as in the same category with buyers and sellers, and to say that they are dealing at arms' length, we think is a mistake. Surely when a man and woman are on the eve of marriage, and it is proposed between them, as in this instance, to enter into an ante-nuptial contract upon the subject of the enjoyment and disposition of their respective estates, it is the duty of each to be frank and unreserved in the disclosure of all circumstances materially bearing on the contemplated agreement.' We held that the relation existing between betrothed persons was one of the confidential relations which require uberrima fides in all transactions between them."

The court below, upholding the antenuptial agreement, *assumed* but did not decide that the provisions therein for Mrs. Vallish were unreasonably disproportionate to the assets of the decedent but concluded that a *full* disclosure of decedent's assets had been made at

the time the agreement was executed. It is clear beyond any question that the agreement made no provision for Mrs. Vallish and that the agreement was disproportionate to the value of decedent's assets. Under our case law, in view of the obvious absence of any provisions for Mrs. Vallish, unless a full disclosure was made of decedent's assets at the time of the agreement, this agreement would be invalid; determination of the question of disclosure must depend upon that which the record discloses.

Common sense would seem to require that, in order to determine whether there was a *full* disclosure of decedent's assets, it was a sine qua non to establish the *extent* and the *value* of decedent's assets on the date of the agreement and whether the disclosure made was complete and full would depend on *what* was disclosed in relation to the extent and value of the *total* assets. The record reveals that the proponents of the agreement resisted the attempt of Mrs. Vallish's counsel to present proof of that which decedent owned and its value and such resistance was upheld by the court. The end result is that the record is barren of *any* evidence in this respect. To argue, as do the agreement proponents, that the assets shown in the inventory, filed after decedent's death and almost seven years after the agreement, supplies such information is utter nonsense; proponents made *no effort* to show that the assets shown in the inventory reflected, as to extent or value, that which decedent owned on the date of the agreement.

Proponents' sole witness as to disclosure was Mr. Berninger, an attorney, and he stated that Mrs. Vallish did not show much interest in what transpired; that decedent said he owned realty in Locust Township and Mount Carmel, a "bank account, either check or savings" which was "not large"; that decedent mentioned "stock certificates" but the witness could not

"remember the corporation"; that decedent first estimated his assets at "between $50,000 and $75,000" and later "between $75,000 and $100,000" but not over $100,000. On cross-examination, the witness could not state whether Frank Valeski, the other subscribing witness, was present when the agreement was signed; he stated that he was sure decedent mentioned the total value of his personalty but could not recall such value, that he could not recall that decedent ever told him he had any bonds but he recalled that stocks were discussed of which he could recollect only Pennsylvania Power & Light Company stock, that decedent never itemized the personalty and that, while bank stock was mentioned, he could not recall the name of the bank. We must accept, as did the court below, the credibility of this witness; such acceptance, however, does not preclude an evaluation of the weight to be accorded such testimony.

On the other hand, Mrs. Vallish made every effort, albeit unsuccessfully, to show with some degree of precision just what decedent's assets actually were when the agreement was signed but such efforts were frustrated by the court, both at the third hearing and, subsequent thereto, by an affidavit of counsel as to the manner in which such proof would be presented. At the third hearing, when Mrs. Vallish's counsel offered such proof the court sustained an objection thereto stating "we have closed the record"; thereupon, counsel requested the right to make a formal offer upon the record "as to exactly what evidence [he] would produce on this subject" to which the court then responded "you may make the offer but it will not be transcribed". The exclusion of such proof and the refusal even to permit the formal offer of proof to be transcribed as part of the record constituted palpable error. Such evidence was germane to the issue and of vital importance in determining whether a *full* dis-

closure had been made. On this ground the matter must be remanded to the court below for further hearing so that such evidence could be made a matter of record.

Bearing in mind that execution of the agreement has been conceded, we examine the agreement itself. This agreement, copied verbatim from a form book (6 Dunlap-Hanna Pennsylvania Forms), was prepared by decedent's own counsel and Mrs. Vallish was not represented by counsel; while no schedule of assets is attached to the agreement, not even an estimate of the value of assets appears in the agreement. Cf. *Kaufmann,* supra. The proponents of the agreement stress the third paragraph thereof: ". . . the intended husband is seized in fee simple of certain real property and owns certain personal property *the value of which has been fully disclosed to the intended wife."* (Emphasis added). Such a provision, while *prima facie* evidence that a full and fair disclosure had been made by decedent to his intended wife, is rebuttable and the burden of proof to show the absence of such full and fair disclosure rests upon the wife. See: *McClellan Estate,* 365 Pa. 401, 406, 75 A. 2d 595 (1950) and cases therein cited. However, the fact that such provision is contained in the agreement is nowise conclusive, particularly in the light of other circumstances herein presented.

While the court below was correct, record-wise, in stating that, subsequent to her first husband's death, Mrs. Vallish "was left in very meager circumstances with only a small estate and a monthly social security payment", its statement that she "was not accustomed to a . . . luxurious standard of living prior to her second marriage" is not supported by the record which is completely silent on the manner in which Mrs. Vallish lived, either prior to or after her marriage to decedent. Under decedent's will, Mrs. Vallish was given the al-

ternative choice between receiving $50 per month for slightly over four years or maintaining a residence in decedent's home saddled with the expenses of its maintenance; it is evident that either testamentary alternative was wholly inadequate for the widow of decedent. While *some* provision was made in the will, no provision of any sort was made in the agreement for Mrs. Vallish. The testamentary provision, inadequate and meager as it is, cannot breathe vitality into the challenged antenuptial agreement.

The decedent's failure to make adequate provision, proportionate to the value and extent of his assets, in the agreement for his intended spouse entails certain consequences: first, the burden of proving that, prior to Mrs. Vallish's execution of the agreement, decedent had not *fully* disclosed to her the extent and value of his assets rested upon Mrs. Vallish and, second, if, by clear and convincing evidence, Mrs. Vallish sustained such burden, then a presumption of fraudulent concealment arose the rebuttal of which rested upon the proponents of the agreement.

It is well settled, as we have noted, supra, that a confidential relationship exists between parties who are betrothed to marry. See: *Kline v. Kline,* 57 Pa. 120, 122 (1868); *Tiernan v. Binns,* 92 Pa. 248, 251, 252 (1879); *Smith's Appeal,* 115 Pa. 319, 324, 8 A. 582 (1887); *Neely's Appeal,* 124 Pa. 406, 424, 16 A. 883 (1889); *Groff's Estate,* 341 Pa. 105, 109, 110, 19 A. 2d 107 (1941); *McClellan Estate,* 365 Pa. 401, 407, 75 A. 2d 595 (1950). Such a confidential relationship imposes upon each party the duty of frank and unreserved disclosure of all circumstances which materially bear on the contemplated agreement. However, despite the lack of *any* provision for Mrs. Vallish in this agreement, it remained the burden of Mrs. Vallish to prove that decedent had not *fully* disclosed his assets to his intended wife.

Present at the time the agreement was executed were Attorney Berninger, his secretary, decedent, Mrs. Vallish and Frank Valeski. We have already summarized the testimony given by Mr. Berninger. Mr. Berninger's secretary was neither called as a witness nor was there any explanation given why she was not called as a witness.[2]

The testimony of Frank Valeski, a subscribing witness to the agreement, was produced by Mrs. Vallish and, according to Mr. Valeski, the parties met only on the date the agreement was signed,[3] that the entire discussion lasted 10 to 15 minutes and that he could not recall details of that discussion.

In the court below, Mrs. Vallish's competency to testify under the so-called "Dead Man's Rule" (June 11, 1891, P. L. 287, 28 P.S. §325) became an issue. Under that statute, Mrs. Vallish was incompetent to testify as to any occurrence which took place prior to decedent's death unless her incompetency was waived by the production by the proponents of the agreement of a "living witness" to such occurrence. Unless Attorney Berninger, a "living witness" to that which had occurred at the time of execution of the agreement, had been called as a witness by the proponents of the agreement, the testimony of Mrs. Vallish would have been incompetent. In its opinion, the court below stated that *it* had called Mr. Berninger as the court's

---

[2] In its opinion, the court below stated: "Nancy L. Kline, the notary public who notarized the instrument at the bottom of the second page, was also employed by Mr. Berninger as a legal secretary. She typed the agreement but is unable to shed any light on the matter of disclosure which occurred in her absence." Save for the signature of Nancy L. Kline as a notary public and the fact she was such a secretary, there is not a scintilla of evidence to support the court's statement as to the secretary.

[3] It is to be noted that Mr. Berninger could not recollect whether he saw the parties twice or three times concerning the agreement.

witness to testify. The record before us indicates that Mr. Berninger "was *called*, sworn and examined" (Emphasis added) by counsel for the agreement proponents. We are bound by the record before us and the record indicates that counsel for proponents, not the court, called Mr. Berninger as a witness. The testimony of Mr. Berninger, produced by the agreement proponents, rendered Mrs. Vallish's testimony competent. See: *Commonwealth Trust Co., Administrator v. Szabo*, 391 Pa. 272, 283, 284, 138 A. 2d 85 (1957) and authorities therein cited, footnote p. 284; *Rosche v. McCoy*, 397 Pa. 615, 626, 156 A. 2d 307 (1959).[4]

Mrs. Vallish was called to testify at the first hearing, after Mr. Berninger had testified and the court ruled that she was incompetent to testify under the statute.[5] At the third hearing, and then only after an additional request by Mrs. Vallish's counsel, the court permitted Mrs. Vallish to testify but severely restricted her testimony to a rebuttal of Mr. Berninger's testimony. The restriction on her testimony was such that Mrs. Vallish did not have the opportunity to present fully whatever evidence she might have to sustain her burden of proof.

Mrs. Vallish testified that in 1958 decedent proposed marriage and that, before she executed the agreement, decedent told her he owned a building in Mount Carmel and an unspecified number of shares of stock in A. T. & T. and Pennsylvania Power and Light Company, a farm with two houses thereon which produced rentals of $100 monthly, plus social security benefits.

---

[4] Whether, under the instant circumstances, the court had the authority to call Mr. Berninger *as its own witness* and, by such action, avoid the waiver of the statute we need not determine. Cf. *Kline's Estate*, 322 Pa. 374, 377, 186 A. 364 (1936).

[5] In its opinion, the court below stated that it did not rule that she was incompetent but reserved a ruling on this question. Unfortunately, the record indicates otherwise.

Mrs. Vallish denied that decedent told her he owned a mortgage, bank stock and/or government bonds, that she knew or was told of the amount or value of decedent's stock or that she was given any general estimate of the extent or value of his assets.[6]

A review of this record indicates clearly that Mrs. Vallish was so restricted in her testimony that she was unable to adequately present proof, if she could, of the absence of a full and fair disclosure of decedent's assets to her and to sustain the burden of proof which the law imposes upon her. Moreover, the court below erred in not permitting the introduction of evidence to show with certainty the extent and value of the assets at the time of the agreement; had the court below permitted the introduction of such evidence, such evidence coupled with Mrs. Vallish's unrestricted testimony might well have shown the absence of a full disclosure of assets.

Mrs. Vallish, the person who attacks the validity of this agreement, had the burden of presenting evidence that, at the time of execution of the antenuptial agreement, a full and fair disclosure had not been made to her of decedent's then assets. The refusal of the court below to permit Mrs. Vallish to testify save in a limited manner to the circumstances leading up to and surrounding the execution of the agreement and the refusal of the court below to permit Mrs. Vallish to present evidence of the value and nature of decedent's assets at the time of the agreement placed such obstacles in her path as made it almost impossible for her to prove, if she could, the absence of a full and

---

[6] In this connection, it is significant that Mrs. Vallish testified that, throughout their marriage, decedent filed his own and not joint income tax returns. By reason of the "Dead Man's Rule", supra, this testimony was stricken from the record properly but the court refused to permit Mrs. Vallish's counsel to establish such fact by other evidence.

fair disclosure. Because of these errors in the trial court's rulings, the matter must be remanded to the court below for a hearing to give Mrs. Vallish an opportunity to satisfy, if she can, her burden of proving the absence of a full and fair disclosure.

In view of the conclusion reached we need not consider nor determine the charge of Mrs. Vallish's counsel that the court below was biased or prejudiced under the circumstances.

Decree reversed and the matter remanded to the court below for proceedings consistent with the views expressed in this opinion.