**Huebner Estate (No. 1)**

*Marlyn F. Smith,* of *High, Swartz, Roberts & Seidel; Angus M. Russell* and *Richard P. Brown, Jr.,* of *Morgan, Lewis & Bockius,* for accountant.

*Desmond J. McTighe,* of *McTighe, Koch, Brown & Weiss,* for widow and objector, and for James G. Walker, claimant.

*Alonzo R. Horsey,* of *Henderson, Wetherill & O'Hey; Justin G. Duryea* and *W. Horace Hepburn,* of *Duryea, Larzelere & Wilson; Sheldon W. Portner,* of *Fox & Fox;* and *Peter Liebert, 3rd,* for claimant.

*Henderson, Wetherill & O'Hey,* by *Alonzo R. Horsey,* and *Montgomery, McCracken, Walker & Rhoads,* by S. *Jonathan Emerson,* for Dennis Sharkley, claimant.

*Justin G. Duryea,* and *W. Horace Hepburn, Duryea, Larzelere & Wilson,* for Elmer A. Palenscar & Son, claimants.

*Fox & Fox,* by *Sheldon W. Portner,* for Arthur Mattia, individually and trading as Elkins Upholstery Company, claimant.

*Henderson, Wetherill & O'Hey,* by *Alonzo R. Horsey,* and *Peter Liebert, 3rd,* for Arthur Peifer and Robert Peifer, claimants.

## ADJUDICATION

TAXIS, P. J., January 20, 1970.—The first and final account of Mary H. Lambert, executrix, was examined and audited by the Court on December 19, 1969. . . .

Decedent died on July 1, 1965, survived by Sarah W. Huebner, his wife. Decedent's will, dated February 28, 1958, leaves his estate to Mary H. Lambert, his daughter and executrix herein, but his marriage to Sarah W. Huebner on June 17, 1964, invokes section 7(3) of the Wills Act of 1947, under the provisions of which Sarah W. Huebner becomes entitled to one-half of the estate. She is likewise entitled to the

family exemption, and the same is awarded to her. . . .

The administration of this estate has been beset and complicated by the presentation of a variety of claims. Testimony taken in the ensuing litigation totals some 1,200 pages. By far the most complex is that of James G. Walker, brother of Sarah W. Huebner, which is in the amount of $59,971.86. Since an analysis of the record on this claim will take considerable time, this adjudication is being prepared disposing of all of the other claims, in order to extend no further the three-year wait for payment of some of the claimants. A supplementary adjudication will pass on the Walker claim in due course.

## CLAIMS OF ARTHUR F. PEIFER AND ROBERT J. PEIFER

These claims are almost identical and will be disposed of together. Prior to 1956, claimant, Arthur F. Peifer, owned 88 shares of a corporation known as Litchfield Produce Sales Co., and claimant, Robert J. Peifer, his son, owned 87 shares. They also were shareholders in a separate corporation known as Litchfield Produce Co., which at about that time fell into financial difficulties and came to be managed by a voting trust of certain shareholders. The trustees of this trust insisted that the Peifers cease owning stock in both corporations, because of a possible conflict of interest, and as a result, in 1957, certificates for the Peifers' shares in Litchfield Produce Sales Co. were endorsed in blank by them and turned over to Russell J. Huebner, who previously had had certain business dealings with claimants.

Claimants' statement alleges that this transfer was made only to permit claimants to present the appearance of having parted with their interest in Litchfield Produce Sales Co., without actually doing so. They contend that beneficially they never ceased

to own the shares, that they had no intention to give them to decedent, and that they were never paid for them. They have attempted to prove these contentions with their own testimony, some pieces of correspondence with decedent, and also by eliciting certain admissions of fact from the executrix. The estate has countered with several defenses, which will be discussed below to the extent necessary.

Preliminarily, a substantial problem exists concerning the competency of claimants to testify, because of the Act of May 23, 1887, P. L. 158, sec. 5, 28 PS §322, the dead man's rule. This problem is made knotty by the offer of each claimant to testify, not in support of his own claim, but on behalf of the claim of the other. It is conceded that each claimant is barred as to his own claim; but counsel for the Peifers strenuously urges that the rule does not prevent them from proving each other's case. However, we have reached the opposite conclusion.

As in many cases involving the dead man's rule, the line between competency and incompetency is a fine one. Surely, if the claim of only one of these parties were presented, the other party could testify in support of it. Likewise, the mere fact that a proposed witness also happens to be a claimant against the estate in a separate matter will not bar his testimony: Houston's Estate, 318 Pa. 300. But the case at hand is not precisely either of these situations; it involves an additional factor which determines this issue adversely to claimants.

The critical factor in determining competence is whether or not the witness has an interest adverse to decedent. If the dead man's rule is to be properly applied, it must be on the basis of its substance and its purpose to prevent fraud where the evidence which would defeat it has been lost by death. Although

this matter is presented as two claims, by two claimants, this is merely form; the substance of both claims is that an agreement, *one* agreement, was made between claimants and decedent regarding the Peifer stock. There is no distinction between the facts of each of these claims; there is no possibility that one could succeed and the other fail; and testimony in support of one automatically and unavoidably supports the other as well. Thus, each claimant, even as a witness for the other, exhibits an interest adverse to the estate and is, therefore, incompetent. Cf. Miller Estate v. Shostak, 80 York 96 (1962), which had a result consistent with the above.

Claimants cite Gongaware's Estate, 265 Pa. 512, and Houston's Estate, supra, in support of a contrary result. However, the latter is distinguishable on the basis that there were two separate contracts between decedent and the claimants, who were domestics in his household. They involved different terms and considerations, although both were apparently made at the same time, and both were made to induce the claimants to remain in the employ of decedent. In Gongaware, the facts concerning the alleged incompetence are not very thoroughly treated in the opinion; but it appears, at page 514, that the adversity involved was not so much against the estate as against other witnesses, who themselves claimed ownership of part of the contested property. These cases demonstrate the difficulties encountered in applying this deceptively simple statute, but they do not convince us that the exclusion of claimants' testimony was erroneous.

Claimants also urge that the dead man's rule cannot be applied unless it appears that decedent had an interest in the subject of the litigation, and that his mere possession of the stock certificates and

executed assignments is not sufficient for this purpose. We again are in disagreement, because this is not a "mere possession" case. There is no doubt that the assignments were voluntarily executed by the claimants and the certificates voluntarily delivered to decedent by them. Of course, this does not explain every circumstance of the transaction, but clearly this is not a case where a party is relying entirely upon an unexplained, perhaps accidental or even fraudulent, possession. Comparisons between the present case, on the one hand, and Donsavage Estate, 420 Pa. 587, and Pappas Estate, 428 Pa. 540, on the other, must be rejected. Those cases involve the common situation of possession alone being urged, and found wanting, as an indication of a completed gift and have no application. In the light of this conclusion, it is unnecessary to discuss further the presumption of ownership raised by possession legally and properly acquired (Wigmore, Evidence, 3d Ed., Vol. 9, sec. 2515-2516, and Appeal of the Pennsylvania Co., 86 Pa. 102), which only establish more firmly that decedent had a sufficient interest in this property to permit his executrix to invoke the dead man's rule.

The final issue is whether or not the evidence remaining after the exclusion of claimants' testimony, and the inferences stemming from it, sufficiently prove their case. We must hold that it does not. The burden on one who asserts a claim against a decedent's estate is heavy, expecially where it could have been brought against decedent in life and was not. The claim must be established by clear, direct, precise and convincing evidence: Reuss Estate, 422 Pa. 58. It is true that the estate has here offered no explanation concerning the details of the Peifer transaction; it has not defended on any specific

ground, for example, of pledge, sale or gift, but has, in effect, simply put claimants to their proof. Even in the absence of a positive defense, however, claimants' evidence and arguments are not persuasive.

Claimants contend that section 8-207 of the Uniform Commercial Code (12A PS §8-207), in allowing a corporation to treat the registered owner of stock (here the Peifers) as owner for all purposes, creates a presumption of ownership for all purposes, which shifts the burden of going forward with evidence to the estate. But what then becomes of the presumption of ownership in decedent, stemming from his acquisition and possession of the stock certificates? Factually, decedent's possession of the certificates for eight years together with assignments which he could have completed in his favor resolves this issue in favor of the estate: Donsavage Estate, supra, at page 595. Moreover, the Commercial Code provision is obviously directed to a means by which corporations may protect themselves from liability, not to the determination of the property rights of shareholders or alleged shareholders inter se.

Claimants next urge that decedent's failure to transfer the shares to his name for eight years is a tacit admission that they were not his. They cite no case supporting this contention, and we do not so understand the rule of tacit admissions. Such admissions occur when a person remains silent or takes no action under such circumstances or accusations that a reasonable or prudent person would speak or act, if he desired to refute the inference which his silence or inaction raised. But if decedent did own the shares, he could do with them as he wished, without a need to explain in any way to anyone else why he handled his own property as he did; and if he did not own them, registration would not make them

his. We see no compelling inference one way or the other from his nonregistration of the stock. Besides, claimants, in making this argument, ignore the reverse inference which arises from their voluntary execution of the assignments and transfer of the stock certificates, followed by some eight years of virtual inaction on their part. Though it is unnecessary to pass on the estate's contention that the claims are barred by laches, it seems clear that claimants' conduct over the years weakens their position more than decedent's failure to register the stock weakens the estate's.

The remaining evidence referred to above consists of certain admissions of the executrix to the effect that the estate has no knowledge or records concerning the transaction between decedent and the Peifers, some letters apparently written in 1963 and 1964 by Arthur F. Peifer to decedent (which were probably inadmissible hearsay as well as self-serving statements, but which are so vague and general as to lack any substantial probative value), and some testimony about certain telephone conversations, of which only Arthur F. Peifer's part was heard by the witness. At best, this evidence is only a suggestion of some sort of unfinished business between claimants and decedent.

These claims are substantial, each being for more than $33,000. However, size does not imply genuineness; we are forced to observe that claimants did not help their credibility when they amended their original claim (which was for the purchase price of the stock, and, therefore, recognized decedent's ownership), to the present allegation that decedent was not the owner but only the custodian of the stock, when they recognized that their first claim would probably have been barred by the statute of

limitations. That these claimants allowed a cause of action worth $66,000, against one who was financially responsible, to vegetate for eight years creates an air of incredibility which nothing in the record offsets.

The claims of Arthur F. Peifer and Robert J. Peifer are dismissed.

## CLAIM OF DENNIS SHARKEY

This claim is for $427, and covers the cost of renovating and rebuilding the lawn at decedent's residence, 321 Rosemary Lane, Lower Merion Township, Montgomery County, mainly in October of 1965. All of the work was performed after decedent's death, but, according to the statement of claim, in pursuance of an oral agreement made with decedent in the spring of 1965.

The estate opposes this claim on the ground that no contract was proven. Technically, this is correct, for the testimony of the claimant at the hearing related to the nature of the work done and the amount of the claim, all of which were *post mortem* facts. Claimant had worked for decedent prior to his death, and had been paid by him. In addition, the executrix testified that she herself had paid claimant, after decedent's death, ". . . for work which she knew her father had ordered. . ." As to the work involved in this claim, however, the executrix pleaded ignorance, and stated that she had had no reason to expect claimant to do any work after August, the time at which seasonal lawn care was generally finished.

Counsel for claimant contends that Mr. Sharkey became competent to testify to events occurring before decedent's death, i.e., prove the making of the contract, when the executrix testified that her father had, in fact, ordered lawn work done. They rely on the Act of June 11, 1891, P. L. 287, sec. 1, 28 PS §325 which, in general, renders a surviving party compe-

tent notwithstanding the dead man's rule, whenever the party representing the decedent on the record calls, or has available, a competent witness to testify as to the matters occurring prior to decedent's death which are in issue. Here, however, counsel for *claimant* called the executrix, and the testimony in question occurred during her examination by counsel for the estate; in addition, it did not directly relate to the alleged agreement on which the claim is based, and, therefore, the Act of 1891 does not apply: Gelb Estate, 425 Pa. 117, 122.

Nevertheless, and in spite of the lack of proof of an express contract, the claim is allowable. That the work was properly done, fairly charged for, and benefitted the property, is not questioned. Under such circumstances, the law will not permit the retention of the benefit without requiring restitution to the party who conferred it, and implies an obligation to make such restitution.

". . . A contract implied in law is a fictional contract, or a quasi contract, whereby a duty is imposed upon a person, not because of any express or implied promise on his part to perform it, but rather is imposed upon him by law and in spite of any intention he may have to the contrary. It is entirely different from a contract implied in fact, which is an actual contract, and which arises where the parties agreed upon the obligation to be incurred but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances. Cameron v. Eynon, 332 Pa. 529, 3 A.2d 423; Colish v. Goldstein, 196 Pa. Superior Ct. 188, 173 A.2d 749. Contracts implied in law, or quasi contracts, will be presumed where no proper contract exists, express or implied, and where it is necessary to account for a relation found to exist between the

parties . . .": DeGasperi v. Valicenti, 198 Pa. Superior Ct. 455, 457.

Claimant replaced the existing lawn of decedent's residence, which was temporary, with permanent grass suitable for a residence worth almost $50,000. The executrix was aware that claimant regularly cared for and worked upon the grounds, and concedes that her father employed him to do so. We do not believe that Mr. Sharkey took advantage of decedent's death to perform unordered work, on the chance that he could in some manner recover its cost from the estate. The claim of Dennis Sharkey for $427 is allowed and awarded.

## CLAIM OF ELMER A. PALENSCAR & SON

This claimant is a partnership composed of Elmer A. Palenscar and Elmer J. Palenscar, his son. The firm is a long-established electric contractor, and claims the sum of $3,239.33 for work and materials supplied in making alterations and additions to the electrical system in decedent's residence.

As in the previous claim, the testimony of the claimant was limited to events occurring after decedent's death on July 1, 1965. Substantially all of the work and materials for which the claim is made were supplied *post mortem*, although Mr. Palenscar did some layout and other preliminary work before. There was admitted into evidence a four-page statement dated December 2, 1965, detailing the work that was done. No issue has been raised concerning the quality of the work done or the propriety of the charges therefor.

The claimant called Dr. James G. Walker, decedent's brother-in-law, as a witness. Dr. Walker had allegedly been authorized by decedent in April of 1965 to contract with claimant for the work that was sub-

sequently done, which was part of a major redecorating project undertaken by decedent just prior to his death. The estate alleged that Dr. Walker was incompetent under the dead man's rule to testify to the agency relationship. The reason advanced for the objection was that Dr. Walker had an interest in obtaining payment of this claim by the estate, because he might possibly be personally liable for it if he entered into an unauthorized agreement. It is true that where an agency relationship or the identity of the principal remains undisclosed, the agent is liable on the contract until his principal performs: Joseph Melnick Building and Loan Association v. Melnick, 361 Pa. 328. We believe however, that this aspect of the matter is covered by Dillon's Estate, 269 Pa. 234, 240, where the court said:

"She (the alleged agent) had no certain interest in the result of the litigation and the bare possibility that an action might be brought is no objection to competency. There should be a fixed vested interest, a remote or contingent interest will not answer."

The estate seeks to distinguish Dillon's Estate, on the ground that the agency there involved was clearly disclosed so that the agent could have no personal liability, while here there is allegedly no evidence as to whether there was disclosure or not by Dr. Walker. However, it is not clear from the opinion in Dillon's Estate that there was any testimony about the existence and nature of the agency other than that of the agent herself. Indeed, the opinion sets forth the issue to be decided as whether the agent was "competent as a witness to *prove* her authority as an agent. . ." (Italics supplied).

We, therefore, rule that Dr. Walker was competent, and as his testimony amply demonstrates his agency, the terms of the contract and its proper performance, claimant's case has been properly proven.

It may not be amiss to note that the considerations which obtained in the Sharkey claim relating to the law of quasi-contracts and restitution are, to a considerable extent, applicable here as well. However, as we have concluded that an express contract has been proven, we will not deal further with this point.

The claim of Elmer A. Palenscar & Son for $3,239.33 is allowed and awarded. . . .

The account is confirmed, and it is hereby ordered and decreed that Mary H. Lambert, executrix, as aforesaid, forthwith pay the distributions herein awarded.

And now, January 20, 1970, this adjudication is confirmed nisi.